Carl Ruben HOPPES, Appellant,

v.

The STATE of Texas, Appellee.

Billy Wayne WHITEHEAD, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 01–85–0584–CR to 01–85–0587–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Feb. 5, 1987.

Will Gray, Carolyn Garcia, Houston, for appellant.

John B. Holmes, Jr., Harris County Dist. Atty., Kathlyn Giannaula, Lynn McClellan, Harris County Asst. Dist. Attys., Houston, for appellee.

Before EVANS, C.J., and DUGGAN and LEVY, JJ.

OPINION

LEVY, Justice.

Appellants Carl Hoppes and Billy Wayne Whitehead were separately indicted for the murder of Steven Maxwell and the attempted murder of Ricky Roach, both offenses occurring in the same transaction on November 14, 1983. The trial court granted appellants' motion to consolidate all charges, which were then incorporated in a single trial. A jury found each appellant guilty of murder and attempted murder. The jury assessed each appellant's punishment at 40 years confinement for murder and 20 years confinement for attempted murder.

Appellants bring four points of error. Appellants' first point of error contends that they were denied due process of law, and their right to trial by a fair and impartial jury, when the trial court recessed the trial for two weeks at the conclusion of evidence at the guilt stage, and before the case was submitted to the jury, to permit a juror to take a two-week vacation. Appellants' second point of error urges that the trial court abused its discretion in recessing the trial.

Jury selection began on June 4, 1985. The trial judge informed the jury panel that the trial would probably last five or six days. The trial judge stated that he was warning the jury:

> because if any of you have any real pressing problem for a long duration that would interfere with a long trip, a long-awaited trip, or if you have a relative who plans to go to the hospital tomorrow for major surgery, you want to be there, you planned on being there, let us know, maybe we can help you.

The court then asked the panel, row by row, if the length of the trial "presents a real harsh problem to any of you." Several jurors were then excused by agreement. One juror asked about the trial's impact on the juror's "prepaid," "planned vacation" and was assured by the prosecutor that "we will be through way before the 14th." When the juror asked if the prosecutor was sure, he replied, "A week from this Friday? There is no problem with that." A second juror approached the bench.

> [A JUROR]: Is it pretty accurate when you say five to six days? Is that about right? We have vacation for Canada starting June 15th.
>
> [PROSECUTOR]: We will be through.

Appellants' counsel did not contradict or object to the prosecutor's assurances.

(When discussing the need to recess for the juror's vacation on June 14, appellant's counsel stated, "I recall this lady, when she informed us at the bench that she had this problem, the prosecutor and the court assured us we would be through by the 15th. I said nothing. I did not believe at that time that we would be through by the 15th." Counsel's earlier silence is inexplicable in light of his professed belief that the trial would not be over by June 15.)

On June 11, 1985, a juror approached the bench and informed the court of her concern regarding her scheduled vacation plans, which were to begin on Saturday, June 15. The court assured the juror that she would be on the plane Saturday morning "one way or another" and continued with the trial. Both sides rested on June 14 in the late afternoon. The court announced to both sides that he was going to excuse the jurors until a certain date so that one juror could take her vacation. Appellant objected, contending that such a recess was an abuse of discretion and that there was no statutory authority to recess the trial for two weeks so that a juror could take a vacation. Appellant was concerned with the juror's ability to retain "this mass of material over a two-week vacation period." The court recessed the jury until June 27, 1985.

The trial reconvened on June 27, and before the charge was read to the jury, the following colloquy took place:

[APPELLANT'S COUNSEL]: We again renew our Motion for Mistrial and adjourning the jury for twelve days.

[THE COURT]: Overruled.

[APPELLANT'S COUNSEL]: We ask that the Court interrogate the jurors to ask them if anything happened during the recess that would impair their duties as a juror in this case. I would like to show that my Motion for Mistrial was made on the same complaint as previously and when the Court initially excused these jurors for two weeks—

[THE COURT]: Yes, sir. Let the record so reflect. Mr. McClellan, when you walked out for half a minute, Mr. Gray dictated a motion. Would you please repeat that, Mr. Gray?

[APPELLANT'S COUNSEL]: Without waiving our Motion for Mistrial, we asked that the Court interrogate these jurors to see if anything has happened to them during recess that would influence their deliberations in this case, or impair their ability to serve as fair and impartial jurors.

[THE COURT]: Mr. McClellan.

[PROSECUTOR]: Your Honor, unless there is some indication that there has been something that occurred to the jury, I see no reason to do that.

[APPELLANT'S COUNSEL]: Is the Court going to rule on my request?

[THE COURT]: I will grant your request and word it differently. I am not going to word it exactly the way you said.

[APPELLANT'S COUNSEL]: May I have an objection to the Court's wording after I hear it? Or I may not? (At that point the jury files into the box in the courtroom).

[THE COURT]: Thank you, please be seated, members of the jury. Members of the jury, thank you for being here on time this morning. I wish I could say the same thing about me, but I will explain that to you later. Members of the jury, you have been gone from this Court during a Continuance granted by this Court for ten days. Do any of you have any reason why you feel that anything happened that would prevent you from being a fair juror in this case during your absence? Seeing no hands, the Court will take that to be an answer of no.

A trial court is vested with broad discretion in the conduct of a trial. *Sapata v. State*, 574 S.W.2d 770 (Tex.Crim.App. 1978). In *Johnson v. State*, 583 S.W.2d 399 (Tex.Crim.App.1979), the trial court recessed the case for two days while a juror whose grandson had died of a self-inflicted wound visited with her family. The court held that the trial judge's actions were proper as the judge necessarily has broad discretion to deal with the many unexpected situations which arise during trial.

Tex.Crim.Code P.Ann. art. 35.23 (Vernon 1966) also vests the trial court with discretion to permit the jurors to separate in a felony case until the court has given its charge to the jury, *see Harris v. State*, No. 69,224 (Tex.Crim.App., September 24, 1986) (not yet reported), and the statute does not prohibit the court from declaring a recess and permitting the jurors to separate during the recess.

 Here, the trial court acted within its discretion in recessing the jury prior to the reading of the charge. Appellants do not show that this action harmed them. After the recess, the trial court asked the jury whether anything had occurred during the recess that would prevent the jurors from being fair in their duties, and no juror replied that he could not be fair.

Because the court acted within its discretion, and appellants failed to establish harm, appellants' first and second points of error are overruled.

 Appellants' third point of error contends that they were denied their right to a fair trial by a fair and impartial jury because of prosecutorial misconduct. Appellant specifically complains of the prosecutor's loud "sighing" during the direct examination of a defense witness.

Appellants' counsel made the following objection during the direct testimony of Wayne Hoppes, a defense witness:

[APPELLANT'S COUNSEL]: Your Honor, let the record reflect that the prosecutor has been sitting here emitting enormous sighs in the presence of this jury and shaking his head and looking at the jury. We would move for a mistrial at this time based on the fact that one of these jurors wants to get out of here anyway. And these tactics are designed to impress on the jury that it's the defense that is delaying this trial, when they took an entire week with their testimony.

(Appellant's co-counsel, Carolyn Garcia, also noted that she was about to object to the "sigh-bar remarks.") The court stated that he "had not heard any sighing coming from the district attorney." The prosecutor stated, "Your Honor, I know of no objection to sighing. I can yawn or sigh or do anything else." The court correctly admonished the inappropriate behavior of the prosecutor by stating "if you have been sighing loudly, sonorously, Mr. McClellan, I suggest you quit it." Appellants' motion for mistrial based on prosecutorial misconduct was denied. Appellants' motion to instruct the jurors to disregard the prosecutor's sighing and head-shaking was also denied.

Appellants perfected a bill of exception later that afternoon by offering the testimony of bystanders who had witnessed the prosecutor's sighs. One witness, Susan Alston, stated that the prosecutor had made a "loud sigh-like and shook his head." Her impression was that the prosecutor was indicating that "someone wasn't telling the truth." Another courtroom spectator also testified that the prosecutor was loudly sighing and shaking his head. A third witness called by appellant did not hear the sigh but saw the prosecutor shaking his head. After hearing the bill, the court again denied the motion for mistrial and a motion to instruct the jurors to disregard the prosecutor's comment on the evidence.

The complained of action, although unprofessional and inappropriate, does not amount to reversible prosecutorial misconduct. We conclude that the prosecutor's ostentatious sighing could not possibly have so prejudiced the jury as to cause an unfair trial.

Appellants' third point of error is overruled.

Appellants, in their fourth point of error, contend that the trial court committed reversible error in refusing to permit the appellants to introduce evidence of a polygraph test, where the State had used statements made by Hoppes to the polygraph operator to impeach Hoppes through prior inconsistency.

Prior to trial, the appellants gave the State a report prepared by Bill Fisher, a polygraph examiner, containing statements made by Hoppes before and during a polygraph examination. Hoppes testified, on cross-examination, that the car parked at

the murder scene was facing toward the buffalo pen and not the trailer. The prosecutor then asked Hoppes if he recalled telling Bill Fisher in June, 1984, that the lights on the car pointed toward the two trailers. Hoppes replied that the lights were "facing towards the buffalo pen." Hoppes was again asked if he remembered telling Fisher "that the lights were pointed at the trailers." Hoppes replied that "the trailers were on the other side of the buffalo pen". At this point, appellants' counsel approached the bench to inform the court that counsel intended to "go into that polygraph examination now since he has opened the door on it." A hearing was held outside the presence of the jury. The trial court ruled that the appellants were entitled to prove the remainder of Hoppes's statement to the polygraph examiner, but the appellants would not be allowed to introduce evidence that he had taken a polygraph test, or evidence of the results of that test. A copy of the appellant's statement to Fisher was presented to the court, and the trial court deleted those portions of the statement which referred to the polygraph exam, including the letterhead and signature portions of the statement which indicated that Fisher was a polygraph examiner, a reference to a "pre-test," and questions referring to a polygraph examination and whether Hoppes was telling the truth. Both appellants were instructed not to testify about a polygraph test. Cross-examination continued with the prosecutor again impeaching Hoppes with a prior inconsistency from the statement given to Fisher.

■ It has long been the rule in this State that the results of a polygraph test are inadmissible for all purposes. *Nethery v. State*, 692 S.W.2d 686 (Tex.Crim.App. 1985); *Robinson v. State*, 550 S.W.2d 54 (Tex.Crim.App.1977). A limited exception to this rule is where one party has "opened the door" for the other party to introduce the results from a polygraph test. *Lucas v. State*, 479 S.W.2d 314 (Tex.Crim.App. 1972.) In *Lucas*, the defendant testified that he had agreed with the district attorney to take a polygraph test and that the district attorney had agreed that if the defendant passed it, the case would be dis-

missed. Lucas further testified that results of the test showed that he was not guilty of the offense charged. The district attorney was allowed to testify that Lucas had not passed the test. The defendant complained of the district attorney's testimony on appeal; however, the court held that "under the particular facts of this case the appellant 'opened the door' for the State to introduce the complained of testimony." In *Patteson v. State*, 633 S.W.2d 549 (Tex.App.—Houston [14th Dist.] 1982, no pet.), the defendant convinced the trial judge that polygraph results were admissible in non-jury trials. The defendant, over the State's objection, presented evidence of a pre-trial polygraph examination which indicated he was truthful. The State then offered rebuttal polygraph evidence and an in-court polygraph examination which indicated that Patteson was not being truthful. On appeal, Patteson complained of the trial court's error in allowing him to initially introduce polygraph evidence as well as the State's rebuttal polygraph evidence. The appellate court held that the defendant had opened the door to the polygraph testimony.

■ No such door was opened in this case. The prosecutor did not refer to the statements as relating to a polygraph examination. No mention of the polygraph test given Hoppes had been made by the prosecutor. The use of specific statements from the polygraph examination for impeachment purposes was proper and did not open the door to disclose to the jury the results of the examination.

■ Neither did former Tex.Code Crim.P.Ann. art. § 38.24 (Vernon 1979) (since repealed) permit the introduction of the results of the polygraph examination under the circumstances of this case. Article 38.24 provided:

When part of an act, declaration or conversation or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other, as when a letter is read, all letters on the same subject between the same parties may be given. When a detailed act,

declaration, conversation or writing is given in evidence, any other act, declaration or writing which is necessary to make it fully understood or to explain the same may also be given in evidence.

Code of Criminal Procedure, ch. 722, art. 38.24, 1965 Tex.Gen. Laws 317, 470, *repealed by* ch. 685, sec. 9, 1985 Tex.Gen. Laws 2472, 2474. The purpose of art. 38.24 was to reduce the possibility of the fact-finder receiving a false impression from hearing the evidence of only a part of the conversation, writing, act, or declaration. The theory behind the rule was that by allowing the jury to hear the rest of the conversation on the same subject, the whole picture will be filled out, removing any misleading effect which may have occurred from introduction of only a portion of the conversation. *Roman v. State*, 503 S.W.2d 252 (Tex.Crim.App.1974). Statements from the polygraph examination are not the "same subject" as the results of the polygraph examination, which are inadmissible.

Appellant's fourth point of error is overruled.

The judgment is affirmed.