**James R. LONG, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 06–98–00179CR.**

Court of Appeals of Texas, Texarkana.

Argued June 25, 1999.

Decided Jan. 7, 2000.

Stanley G. Schneider, Schneider & McKinney, P.C., Houston, for appellant.

Gail Kikawa McConnell, Asst. Dist. Atty., Conroe, for appellee.

Before CORNELIUS, C.J., GRANT and ROSS, JJ.

## OPINION

Opinion by Justice ROSS.

James Long appeals his conviction for capital murder, with a sentence of life imprisonment. *See* Tex. Pen.Code Ann. § 12.31(b) (Vernon 1994).

About 6:00 a.m. on Saturday, September 21, 1996, Robert Madura, the manager of a Walgreens store in Montgomery County, arrived at the store. He noticed that the alarm had not been activated. When he walked into the office, he found one of his assistant managers, John Cedars, lying dead on the floor. The sum of $2,831.46 was missing from the office safe. Cedars' wallet was also missing.

Medical evidence showed that Cedars had died instantly from a gunshot wound to the head. The weapon had been fired from one to two inches away.

Long contends that the trial court erred in refusing his request for jury instructions on accomplice witness testimony regarding two of the State's witnesses, Billy Woodard and Jeremy Scardino.

■■■ An accomplice witness is a witness at trial who participated with a defendant before, during, or after the commission of a crime. *McFarland v. State*, 928 S.W.2d 482, 514 (Tex.Crim.App.1996); *Kunkle v. State*, 771 S.W.2d 435, 439 (Tex. Crim.App.1986); *Howard v. State*, 972 S.W.2d 121, 125 (Tex.App.-Austin 1998, no pet.). A conviction cannot be had on the testimony of an accomplice witness unless corroborated by other evidence tending to connect the defendant with the offense committed. Corroboration is not sufficient if it merely shows the commission of the offense. Tex.Code Crim. Proc. Ann. art. 38.14 (Vernon 1979); *Howard*, 972 S.W.2d at 125–26. The so-called "accomplice witness rule" is not mandated by the United States Constitution or the common law. Rather, it reflects a legislative determination that accomplice witness testimony implicating another person should be viewed

cautiously due to the incentive to lie to avoid punishment or shift blame to another person. *Blake v. State*, 971 S.W.2d 451, 454 (Tex.Crim.App.1998). The rule requires the jury to receive and act on such testimony with caution, considering the selfish interests and possibly corrupt motives of the witness. *Howard*, 972 S.W.2d at 125.

■■■ A person is an accomplice if there is sufficient evidence connecting him or her to the criminal offense as a blameworthy participant. *Blake*, 971 S.W.2d at 455. The participation necessary to be considered an accomplice must involve an affirmative act or omission by the witness to promote the commission of the offense. *Id.* at 454; *McFarland*, 928 S.W.2d at 514. The test is whether there is sufficient evidence in the record to support a charge against the witness alleged to be an accomplice. Whether the person is actually charged and prosecuted for his or her participation is irrelevant; what matters is the evidence in the record. *Blake*, 971 S.W.2d at 455. Witnesses may be accomplices as a matter of law. If there exists no doubt or the evidence clearly shows that a witness is an accomplice witness as a matter of law, the trial court is under a duty to so instruct the jury. *Blake*, 971 S.W.2d at 455. One who is or may be indicted for the same offense with which a defendant is charged, or for a lesser included offense based on alleged participation in the commission of the greater offense, is considered an accomplice as a matter of law. *Ex parte Zepeda*, 819 S.W.2d 874, 876 (Tex.Crim.App.1991). If evidence presented by the parties is conflicting, it is proper to leave the question of whether an inculpatory witness is an accomplice witness as a matter of fact to the jury, under instructions defining the term accomplice. *Blake*, 971 S.W.2d at 455; *see Gamez v. State*, 737 S.W.2d 315, 322 (Tex. Crim.App.1987).[1]

■■■ It is also clear who is not an accomplice witness: a person who is mere-

---

1. In *Marlo v. State*, 720 S.W.2d 496 (Tex. Crim.App.1986), the Texas Court of Criminal

Appeals, in a 5–4 decision, reversed a murder conviction because the trial court failed to

ly present at the scene of an offense is not an accomplice. *Blake*, 971 S.W.2d at 454; one is not an accomplice for knowing about a crime and not disclosing it, or even concealing it. *Id.; Kunkle*, 771 S.W.2d at 439. If the evidence is clear that the witness is not an accomplice witness, no instruction need be given to the jury either that the witness is an accomplice as a matter of law, or in the form of a fact issue whether the witness is an accomplice witness. *Gamez*, 737 S.W.2d at 322.

## WITNESS BILLY WOODARD

██ Billy Woodard was a friend of Long and shared an apartment with him for several months, including the relevant time period. The testimony showed that Woodard overheard Long and Eddie Brown[2] discussing the possibility of robbing the Walgreens store but, at the time, Woodard did not believe they were serious. On the evening of the robbery and murder, Long returned to the apartment and told Woodard what had happened, and showed him the money, ski masks, and victim's wallet taken in the robbery. Woodard further testified that Long told him the details of the murder. Later, Woodard met with Long at the home of Jeremy Scardino's grandmother, where Woodard testified that Long gave the money and other items from the robbery to Jeremy Scardino, so Scardino could dispose of them. Woodard said that he did not go to the police earlier because he was raised in a neighborhood and environment which fostered distrust and animosity toward law enforcement.

The evidence in the record does not demonstrate that Woodard could be considered an accomplice or that he assisted Long in the planning or carrying out of the robbery and murder. There was certainly no basis to, and the State did not, charge Woodard with capital murder or any lesser included offense. The record shows that, at most, Woodard was aware of the offense, did not disclose it, and may have concealed it. Under the cited authority, this does not make him an accomplice and would not entitle Long to an instruction on accomplice witness testimony. The trial court did not err in refusing to instruct the jury regarding Woodard as an accomplice witness.

## WITNESS JEREMY SCARDINO

██ At the time of trial, Jeremy Scardino lived in Austin, Texas. He was a

submit to the jury the fact issue of whether two key witnesses were accomplices. In that case, the evidence showed that both witnesses were present at the murder scene; that a "common understanding" existed between the appellant and the two witnesses that some offense would be committed; that use of deadly force was contemplated, however jokingly; and that both had participated in the disposal of the body, one of them even washing out the bed of the truck afterward. On the other hand, both witnesses asserted that they never anticipated a murder and that they assisted in the coverup only because they were afraid of the appellant. The majority opinion held that, notwithstanding the fact that these assertions were uncontradicted, they "could very well have been discounted under the circumstances presented in this case," *id.* at 500, and "[w]hether there existed 'a common understanding,' or proof of criminal intent' on the parts of [the witnesses] to commit murder ... was properly an issue for resolution by the jury, and the trial court erred in not submitting that issue according-

ly...." *Id.* at 501. The dissenting opinion, finding no conflict in the witnesses' testimonies, would not have required submission of the accomplice factual issue to the jury. *Id.* at 503–04 (Onion, J., dissenting). Subsequent cases citing *Marlo* have emphasized that where there is no conflict in the evidence regarding whether the witness is an accomplice, the trial court may properly refuse to submit that issue to the jury. *See, e.g., Herrick v. State*, 825 S.W.2d 215, 218 (Tex.App.-Houston [1st Dist.] 1992, no pet.).

**2.** Eddie Brown was a key witness against Long, and he participated in the robbery. As an employee of the Walgreens store, he allowed Long to enter the premises after all other employees had departed and, for a time, pretended to be another victim of the robbery. In his testimony, Brown acknowledged his complicity in the robbery, but denied any preconceived intent to kill Cedars. Brown was allowed to plead guilty to aggravated robbery in return for his testimony.

good friend of Woodard and knew Long. He also knew Brown, but not well. Scardino went to Woodard and Long's apartment about a week before the robbery and murder, and heard Long discuss the possibility of robbing the place where Brown worked.

Later on the same day of the robbery and murder at Walgreens, Long and Woodard visited Scardino at his grandmother's house in Spring, Texas. Scardino testified that during this visit Long told him that he and Brown had committed the robbery and murder at Walgreens, and that Long asked him to hold the money and dispose of other items from the robbery. Long then gave Scardino the money, along with ski masks, a lock, a wallet, and some pieces of paper. Scardino immediately threw away the masks and the lock while at his grandmother's house. At that time, he was living in an apartment in Houston, where he took the money and wallet. Later, he threw the wallet in the dumpster at Long's apartment.

Long later contacted Scardino and told him to give the money to Brown. Scardino and Brown met at a restaurant near Scardino's apartment. Brown drove up in his car, and Scardino handed the money to him through the car window.

Scardino gave authorities a written statement after he entered into an immunity agreement with the Montgomery County District Attorney's office.

The record does not show that Scardino was an accomplice as that term has been considered in Texas law. Scardino did not assist either Brown or Long in planning the robbery and was not involved in the execution of the plan or the resulting homicide. There was no basis on which the State could charge Scardino with capital murder or with any lesser included offenses arising out of the robbery and murder. As with Woodard, the most that can be said is that Scardino knew about the crime, did not disclose it, and possibly concealed it. Under the authority previously cited, these actions are not sufficient for Scardino to be considered an accomplice. The trial court did not err in refusing Long's request for an accomplice witness instruction with respect to Scardino's testimony.

■ Long also contends that the trial court erroneously denied his challenges for cause regarding two prospective jurors.

Long's trial counsel made the following request, which was denied by the trial court:

Your Honor, at this time before she calls out the strikes, the defendant would make a motion to the Court to have the Court grant us at least two more strikes for peremptory challenge for the Court denying, in our view improperly, the challenges for cause that we made to several of the jurors; and we would ask the Court to grant us two additional strikes, because we've had to use strikes on jurors that the Court in our mind should have excused for cause.

■ When the trial court erroneously overrules a challenge against a venireperson, a defendant is harmed only if he uses a peremptory strike to remove the venireperson and thereafter suffers a detriment from the loss of a strike. Error is preserved for review on appeal only if appellant: 1) used all of his peremptory strikes, 2) asked for and was refused additional peremptory strikes, and 3) was then forced to take an identified objectionable juror whom the defendant would not otherwise have accepted. *McFarland*, 928 S.W.2d at 508; *Chambers v. State*, 866 S.W.2d 9, 23 (Tex.Crim.App.1993); *Garcia v. State*, 960 S.W.2d 329, 331 (Tex.App.-Corpus Christi 1997, no pet.).

While the record shows that Long requested additional peremptory strikes, the record does not show that Long had used all of his strikes and, further, does not show that he was forced to take an identified objectionable juror. Long does not identify any objectional juror or jurors. Under the above-cited authority, Long has

failed to demonstrate how he was harmed by the alleged error. These points are, therefore, denied.

Long further contends that the trial court erred and abused its discretion in excluding the testimony of Raymond Phillips and Jamie Donohue. The exact ruling by the trial court was as follows:

Okay. The Court's ruling remains the same. The proffered bill, the Court finds, is not relevant to the issues the jury is called upon to decide. To the extent it has any probative value for these issues, the prejudicial effect is—substantially outweighs any probative value it may have for the issue the jury is to decide.

I want the counsel to understand I'm not ruling on the truth, believability or otherwise of these witnesses. It concerns the Court, the testimony that's been elicited; but as far as what this jury is to determine, that's my ruling.

In the course of the discussion on whether to allow the jury to hear Phillips' and Donohue's testimonies, the trial court stated:

Well, it would be relevant had the State put on Phillips and attempted to obtain some testimony from him relevant to this case. The State did not, I assume because they found out the guy says he now lied under oath on this statement.

You now want to build a sandcastle so you can knock it over. I'm not going to let you do that. It's irrelevant at this point.

Rule 401 of the Rules of Evidence defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex.R. Evid. 401; see *Lum v. State*, 903 S.W.2d 365, 371 (Tex.App.-Texarkana 1995, pet. ref'd). In order to be included in this definition, the proffered evidence must have influence over a consequential fact, i.e., any fact that

is of consequence to the determination of the action. *Mayes v. State*, 816 S.W.2d 79, 84 (Tex.Crim.App.1991); *Wells v. State*, 880 S.W.2d 185, 187 (Tex.App.-Texarkana 1994, pet. ref'd). Questions of relevance should be largely left to the trial court, relying on its own observations and experience, and will not be reversed absent an abuse of discretion. *Moreno v. State*, 858 S.W.2d 453, 463 (Tex.Crim.App.1993); *Wells*, 880 S.W.2d at 188. Appellate review of the trial court's rulings admitting or excluding evidence are subject to an abuse of discretion standard. *Rachal v. State*, 917 S.W.2d 799, 816 (Tex.Crim.App. 1996). If the trial court's decision is within the bounds of reasonable disagreement, the appellate court will not disturb the trial court's ruling. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App.1990). Raymond Phillips testified as follows by way of a bill of exception and out of the jury's presence:

Around April 1997, he resided in the same apartment as did Long. At his apartment, Phillips was placed in a police car and taken to the Montgomery County Law Enforcement Center in Conroe. He was taken into a small room and interrogated by a detective of the Montgomery County Sheriff's Department. Initially the detective, who is African–American, sought to be friendly with Phillips, who is also African–American. However, this friendly demeanor disappeared as the detective sought information from Phillips regarding Long's involvement in the Walgreens robbery and homicide. Phillips was questioned as to how he could be good friends with a "white guy." When Phillips told the detective he did not know anything about the robbery and murder, the detective refused to believe him. Phillips was handcuffed, and a piece of paper was put in front of him. He was told to write a statement regarding what he knew concerning the robbery and murder at Walgreens. When Phillips wrote "I don't know" on the paper, the detective crumpled it and threw it away.

Phillips was given another piece of paper, and the detective left the room. On returning and discovering that Phillips had written, again, that he did not know anything, the detective became very upset. Phillips said that the detective is a large, muscular individual and was angry. Phillips said he was in handcuffs and was frightened and intimidated. The detective then began illustrating with his finger, jabbing at Phillips' head, how someone, like the victim in this case, could be shot in the head. Phillips was again asked to write what he knew, and when Phillips again said that he did not know anything, the detective kicked the chair from under Phillips, causing him to fall to the floor. He then jerked Phillips up by the handcuffs and told him what to write. After Phillips had written this statement, he was taken back to his apartment, where he told his apartment manager, Jamie Donohue, about the incident. Phillips' written statement (which was not introduced as evidence by the State at trial) was, according to Phillips, completely false.

After being subpoenaed by the district attorney's office to testify in this case, Phillips was told to talk to the assistant district attorney in charge of the prosecution. Phillips went to the attorney's office with Woodard. Phillips told the attorney that the written statement was false and told him the circumstances under which it was given. The attorney told Phillips that he thought his treatment was wrong and that they did not intend to call him as a witness, but that he did not want to get involved with that particular detective. He told Phillips that the detective was in the building in which they were meeting; he also told Phillips to file a complaint. The attorney then said, "Well, fuck it. Let's go home."

Jamie Donohue testified, also under a bill of exception and out of the jury's presence, as follows:

She was the manager of the apartment building in which Phillips lived in April 1997. She saw the Montgomery County sheriff's car being driven away with Phillips inside. She spoke with Phillips after he returned and observed that he was very upset. She also observed that the T-shirt he was wearing was stretched out of shape and there were red marks on the side of his neck.

We must determine whether the trial court abused its discretion by not admitting this testimony. If the State had called Phillips as a witness, or if it had attempted to introduce his written statement into evidence, then the determination whether the statement was made voluntarily would not only have been relevant, but constitutionally required. *See Crane v. Kentucky,* 476 U.S. 683, 687–88, 106 S.Ct. 2142, 90 L.Ed.2d 636, 643 (1986). However, the State did not introduce Phillips' testimony, and there was no testimony that similar interrogation techniques were utilized to obtain information from the other key witnesses in the case.

In *United States v. Wickersham,* 29 F.3d 191 (5th Cir.1994), the Fifth Circuit upheld the ruling of the district judge barring admission of evidence of alleged prosecutorial misconduct. The appellant's attorney had wanted to introduce at trial the testimonies of the co-defendant's attorneys, whom he contended would testify that a United States attorney threatened a witness with indictment if he did not change his grand jury testimony. After an evidentiary hearing, the district court found that no threats had been made, but also held that such evidence was not relevant. *Id.* at 193–94.

Phillips' intimidation, if it occurred, should be condemned as inappropriate conduct. It was not, however, a matter that would aid the jury because Phillips' testimony was not before it. The trial court did not abuse its discretion, and these points of error are overruled.

Long further contends that the trial court committed reversible error in sustaining the State's objection to Kelly Hendricks' testimony regarding the specific polygraph questions asked of Brown. Long contends that such evidence should have been admitted under the rule of optional completeness, which provides that:

> When part of an act, declaration, conversation, writing or recorded statement is given in evidence by one party, the whole on the same subject may be inquired into by the other, and any other act, declaration, writing or recorded statement which is necessary to make it fully understood or to explain the same may also be given in evidence, as when a letter is read, all letters on the same subject between the same parties may be given.....

TEX.R. EVID. 107. Long claims that according to this rule, the State "opened the door" to such testimony when Detective Bryan Dubose testified on direct examination that Brown had failed his polygraph test. Long contends that the specific questions asked, and the techniques employed by Kendricks, the polygraph expert, would demonstrate for the jury exactly how Brown had lied, particularly, "the jury may have been left with the false impression that Brown failed [the polygraph test] because he lied about excluding Appellant."

During the direct examination of Dubose, the assistant district attorney asked him why he had accompanied Brown to Houston. Dubose testified that, because Brown had failed his polygraph test, Dubose wanted to get more information from Long about Brown's potential involvement in the case. Long did not object to the introduction of this testimony. During the direct examination of Brown, the assistant district attorney inquired of Brown whether he had been given a polygraph test, to which Brown responded in the affirmative, and further asked Brown if he had been told how he did on the test, to which Brown responded that he had failed it.

Once again, Long did not object to the introduction of Brown's polygraph examination results.

The appellate courts of this state have uniformly refused to permit the results of polygraph examinations to be admitted at trial, for either the defendant or the State. *Robinson v. State,* 550 S.W.2d 54, 59 (Tex.Crim.App.1977); *Romero v. State,* 493 S.W.2d 206 (Tex.Crim.App.1973) (lie detector test results not admissible, even by stipulation). Because of their inherent unreliability and tendency to be unduly persuasive, polygraph examination results are inadmissible on proper objection for any purpose in a criminal proceeding. *Marcum v. State,* 983 S.W.2d 762, 765 (Tex.App.-Houston [14th Dist.] 1998, pet. ref'd); *see also Nethery v. State,* 692 S.W.2d 686, 700 (Tex.Crim.App.1985); *Banda v. State,* 727 S.W.2d 679, 681 (Tex. App.-Austin 1987, no pet.).

However, Long insists that once the State introduced the results of the polygraph examination into evidence, it "opened the door" to further inquiry into this subject and further inquiry was the allowable way to remedy the false impression the testimony left with the jury. The general idea behind this proposition is that once one party has begun an inquiry into a particular subject, that party cannot complain when the opposing party desires to go into the details of that subject. Evidence used to fully explain a matter opened up by the other party need not ordinarily be admissible. *Parr v. State,* 557 S.W.2d 99, 102 (Tex.Crim.App.1977). Long contends that by not allowing him to clarify why Brown failed the polygraph test, the jury may have been left with a false and harmful impression that all Brown had been asked about was his involvement, and that this testimony, with nothing more, would allow the State to benefit unfairly from normally inadmissible, unduly persuasive evidence.

In certain limited instances, it is true that polygraph evidence, which was erro-

neously admitted at trial, has "opened the door" to further inadmissible evidence regarding the polygraph results. *See Lucas v. State,* 479 S.W.2d 314, 315 (Tex.Crim. App.1972); *Patteson v. State,* 633 S.W.2d 549, 552 (Tex.App.-Houston [14th Dist.] 1982, no pet.). However, these cases are distinguishable from the case at hand. In the *Lucas* case, the defendant, testifying on his own behalf, stated that he had made an agreement with the district attorney to take a polygraph test, that the district attorney had agreed that if he "passed" the test his case would be dismissed, and that the results of the test showed that he was not guilty. Thereafter, the Texas Court of Criminal Appeals held that the state should be allowed to introduce evidence that the defendant, in fact, did not pass the polygraph test. *Lucas,* 479 S.W.2d at 315. Allowing an opposing party to correct a misstatement of the results of a polygraph examination, though, is very different from the circumstances of the case at hand.

In the *Patteson* case, a court of appeals also allowed further explanation by the state of polygraph examination results after the results were first introduced into evidence by the defendant. In this case, the defendant successfully, and incorrectly, persuaded the trial court that his polygraph evidence was admissible since this was a nonjury trial. *Patteson,* 633 S.W.2d at 551. Additionally, it is important to note that when the defendant originally attempted to introduce this evidence, the state did object. *Id.* at 550. Therefore, due to the circumstances surrounding the introduction of the polygraph results in the *Patteson* case, and due to the fact that the opposing party lodged an objection to the introduction of this evidence, this case is distinguishable from the case at hand.

 In the instant case, Long never objected to the inadmissible polygraph evidence when it was introduced by the State. To preserve error, it has been consistently held that one must object each and every time inadmissible evidence is

offered. *Ethington v. State,* 819 S.W.2d 854, 858 (Tex.Crim.App.1991). This rule remains true with regard to testimony regarding polygraph examination results. *See Leach v. State,* 548 S.W.2d 383, 385 (Tex.Crim.App.1977); *Banda,* 727 S.W.2d at 681. Long should have objected to all references that were made regarding polygraph results in order to preserve error for review. *See Leach,* 548 S.W.2d at 385; *Banda,* 727 S.W.2d at 681. Further, had Long properly objected to the testimony regarding Brown's polygraph examination results and insisted on a mistrial, Long would have been entitled to receive this mistrial. When a defendant immediately objects to testimony that reveals the results of a polygraph test of the defendant or other crucial witness, the harm is so great that it cannot be cured by an instruction to disregard. *Nichols v. State,* 378 S.W.2d 335, 337–38 (Tex.Crim.App. 1964); *Banda,* 727 S.W.2d at 682. In such circumstances, the defendant is entitled to a mistrial. *See Banda,* 727 S.W.2d at 682.

Long did not choose to object to this inadmissible testimony. He did not choose to move for a mistrial, to which he was entitled. Instead, he attempted to use the rule of optional completeness to mitigate damage done by the very inadmissible evidence that he willingly allowed to be introduced. The rule of optional completeness does not and should not work to reward this type of behavior. In other similar types of situations, when a party should have objected to the introduction of inadmissible evidence that was presented, and failed to do so, that party has not been allowed to present additional improper evidence under the guise of rebuttal. *See Nixon v. State,* 653 S.W.2d 443, 444 (Tex. Crim.App.1983); *White v. State,* 590 S.W.2d 936, 937 (Tex.Crim.App. [Panel Op.] 1979); *Wiggins v. State,* 778 S.W.2d 877, 892 (Tex.App.-Dallas 1989, pet. ref'd) (these cases all deal with means of impeaching a person's character and hold that a party who does not object to inadmissible evidence when it is introduced

may not then impeach that witness with other inadmissible evidence on rebuttal). In this situation, Long was rightfully prevented from introducing additional inadmissible evidence of Brown's polygraph test to counteract the inadmissible evidence that he willingly allowed the State to introduce into evidence. The trial court excluded the inadmissible evidence concerning the polygraph test at the first opportunity it had to do so, and if Long was truly concerned about the false impression that the inadmissible polygraph evidence was going to leave in the minds of the jurors, then he should have objected to the introduction of this evidence and demanded a mistrial. By not doing so, Long has missed his opportunity to receive a new trial.

Additionally, even if the trial court did in fact err by not allowing Long to clarify why Brown failed the polygraph examination, this error did not affect Long's substantial rights. A substantial right is affected "when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim.App.1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557, 1572 (1946)). In *Kotteakos*, the United States Supreme Court explained the standard of review as follows:

> If, when all is said and done, the [reviewing court] is sure that the error did not influence the jury, or had but very slight effect, the verdict and judgment should stand, .... But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.

*Kotteakos*, 328 U.S. at 764–65, 66 S.Ct. 1239.

In the case at hand, even if the trial court erred by excluding evidence of the specific questions given to Brown on the polygraph examination, the effect this had on the jury's verdict was slight, at most. Long argues that excluding this evidence left the false impression with the jury that Brown failed his polygraph test because he lied about whether Long had committed the murder, when in fact the test indicated that he failed the polygraph test because he lied about his own involvement in the murder. However, there is no reason to assume that the jury inferred any such thing from the disclosure of these polygraph results and, in fact, in the context of the questions that were asked regarding Brown's failure of the polygraph examination, it seems more likely that the jury would have inferred exactly the opposite of what Long is contending. The context of the questions logically point to the fact that Brown failed the test because he was lying about his own involvement in the murder, not Long's. For example, during the direct examination of Dubose, the following exchange took place:

Q And why did you and Detective Ervin go to Houston?

A Because Eddie Brown had failed his polygraph, and we wanted to get more details from Mr. Long concerning that night when he picked Eddie up.

Q You wanted to speak to James Long again?

A Correct.

Q And what specific details did you want to ask him about? What other information, further information, did you hope to receive from the defendant?

A Well, we wanted to know, you know, exactly what happened again that night; if he picked him up, if he [Brown] was outside, where he [Brown] was located, if he [Brown] had anything with him and what they had done.

Then, during the direct examination of Eddie Brown, the following testimony was given:

Q You lied to cover up your involvement in this incident?

A Yes, sir.

Q Were you given a polygraph test?

A Yes, I was.

Q Did they tell you how you did on the polygraph?

A They told me that I failed it.

Q And did the detectives try and interrogate you and try to get you to give them a confession that day?

A Yes, sir, they did.

Q But you continued to deny your involvement in this; is that right?

A Yes, sir.

Finally, Long called Dubose back to the stand, and during this examination the discussion went as follows:

Q Of course, as early as September the 24th, maybe even earlier, but at least September 24, 1996, the investigation towards Mr. Brown had turned dramatically, had it not, sir?

A Correct.

Q Now, he was not only just a suspect—I mean, just a witness; he had— the pendulum was now pointing to him as a suspect, correct?

A Correct.

Q In fact, it was so bad that his— suspect-wise, that Detective Ervin read him his rights after he failed the polygraph.

A Correct.

When the testimony regarding the polygraph examination was given, it was clear that Brown failed this test because he was lying about his own involvement. The testimony even went so far as to state that when Brown failed the polygraph he, not Long, was the suspect in this murder investigation. There is no reason that the jury would have been left with a false impression regarding why Brown failed

this polygraph examination, and the fact that the court excluded the specific questions asked of Brown during this test does not affect Long's substantial rights. This point of error is overruled.

The judgment of the trial court is affirmed.

Dissenting Opinion by Justice GRANT.

GRANT, Justice, dissenting.

The rationale for the rule of optional completeness[3] is that an opponent should be permitted to correct any misleading impression left with the fact finder through introduction of only a portion of evidence. *See, e.g., Roman v. State,* 503 S.W.2d 252, 253 (Tex.Crim.App.1974). Once a matter is injected into a proceeding, evidence to fully explain the matter is relevant and admissible, even though the evidence might not otherwise be admissible. *Callaway v. State,* 818 S.W.2d 816 (Tex.App.-Amarillo 1991, pet. ref'd). The purpose of the rule of optional completeness is to reduce the possibility of a juror receiving a false impression from hearing only part of some act, conversation, or writing. *Credille v. State,* 925 S.W.2d 112 (Tex.App.-Houston [14th Dist.] 1996, pet. ref'd). The rule of optional completeness seeks to prevent evidence from being unfairly taken out of context.

The Rules of Evidence did not suddenly exist. They came into being over hundreds of years based upon the collective wisdom of human experience. The optional completeness rule, which would suffer severely from the newly-established precedent set by this case, is an example of the role of the Rules of Evidence to provide fairness for both sides in the search for the truth in the courtroom. Every Sunday

---

**3.** The rule of optional completeness was a part of the common law before it was codified in Article 38.24 of the Texas Code of Criminal Procedure. TEX.CODE CRIM. PROC. ANN. art. 38.24 (Vernon 1979). Wigmore's Code of Evidence sets forth the rule of optional completeness under Rule 188. JOHN HENRY WIG-MORE, WIGMORE'S CODE OF THE RULES OF EVIDENCE IN TRIALS AT LAW 376–77 (2d ed.1935). Later it was adopted in Rule 107 of the Texas Rules of Evidence. TEX.R. EVID. 107. The term used for this concept seems to vary from state to state. Some states use the term "rule of completeness." *See State v. Skillicorn,* 944 S.W.2d 877 (Mo.1997).

school teacher in America could quickly demonstrate the dangers of conveying a false impression by quoting only a portion of a writing or conversation and not allowing the remainder of the context to be completed. I lament the willingness of the majority to whimsically impair the functioning of this rule.

In the present case, the reason the defendant was entitled to introduce the evidence concerning the results of the polygraph test was to complete what the State had introduced, which left the jury with an erroneous impression of the result of the polygraph test.

The majority has sought to circumvent this rule by an exception made from whole cloth—an exception not contained in the rule, not contained in any commentary or writing pertaining to the rule, and not contained in any case in the State of Texas or any other jurisdiction. This innovative theory was not raised in the trial court or on appeal in this case.

The majority would apply the rule of optional completeness only if opposing counsel had objected to inadmissible evidence when it was introduced. This new-cloth proposal is flawed. It eliminates any possible strategy in an adversary proceeding of not objecting to evidence which may be favorable when the full picture is shown. However, until the offer is completed, counsel may not be aware that the complete evidence of the act, conversation, or writing is not going to be introduced. At that point, an objection would be too late to prevent the jury from hearing only part of the evidence and forming an erroneous impression. The rule itself, contemplating the importance of the act, conversation, or writing being completed if the other side so chooses, goes so far as to allow the opposing party to complete the matter at the time it is introduced and not require that the opposing party wait until after the examination of the witness or when that party is introducing evidence.

The majority attempts to base this new requirement on cases involving the im-peachment of a person's character. To borrow from Mark Twain, the difference between these two evidentiary principles is analogous to the difference between lightning and the lightning bug.

The three cases cited by the majority to justify their holding do not involve the optional completeness rule and are distinguishable from the present case. In the *Nixon* case, the question was whether the State could introduce improper evidence because its witness testified that the defendant was a good employee and "a very kind guy." The Court held that this did not open the door to impeachment of this witness by "have you heard" questions, holding that this evidence did not place the appellant's character or reputation in issue. The Court held that the State could not under the guise of rebuttal present additional improper evidence of character. *Nixon v. State,* 653 S.W.2d 443 (Tex.Crim. App.1983). In *Wiggins v. State,* 778 S.W.2d 877 (Tex.App.-Dallas 1989, pet. ref'd), the court held that if a nonresponsive answer was inadmissible, the remedy was an objection, a motion to strike, and a request for an instruction to disregard, not admission of rebuttal evidence. This case also involved the defendant's general reputation for truthfulness. In *White v. State,* the sole ground of error was that the trial court had erred in allowing the State to cross-examine a defense witness by asking "have you heard" questions about the defendant's reputation. *White v. State,* 590 S.W.2d 936, 937 (Tex.Crim.App. [Panel Op.] 1979). The Court held there was no reasonable basis for asking "have you heard" questions of a witness who testified to his personal opinion of someone's character, as opposed to the reputation of the person's character. The Court further held that even if this testimony had been inadmissible, the State could not use it as a guide for presenting additional improper evidence.

These cases cited by the majority do not refer to or involve the optional complete-

ness rule. While they do involve opening the door on reputation matters, the optional completeness rule is not applicable to this area of evidence, has never been applied to this area of evidence, and these cases in no way suggest that it is applicable to this area of evidence. Reputation evidence involves a much broader spectrum than is contemplated by the rule of optional completeness, which involves evidence limited to the specific document, conversation, declaration, or writing from which it is specifically quoted.

On the other hand, the cases do not indicate that an objection to the initial testimony is required. For example, in *Kipp v. State,* the Court stated that if a part of a hearsay statement is testified to, the remainder of the statement may be admissible under the rule of optional completeness. The Court did not require an objection to the initial hearsay testimony. *Kipp v. State,* 876 S.W.2d 330 (Tex.Crim. App.1994). In *Martinez v. State,* elicitation of hearsay testimony from an officer by defense counsel, without objection by the State, allowed the State to bring out the rest of the hearsay testimony to clarify the first hearsay testimony. The hearsay testimony elicited by the defense counsel was not objected to by the State. *Martinez v. State,* 749 S.W.2d 556 (Tex.App.-San Antonio 1988, no pet.). The court held that it was not error to admit hearsay evidence when it serves to clarify other hearsay evidence solicited by the opposition, relying on the rule of optional completeness. The State had made no objection to the eliciting of the testimony.

Long contends the trial court committed reversible error in sustaining the State's objection to the testimony of Kelly Hendricks regarding the specific questions asked of Brown at his polygraph examination. Long contends that such evidence should have been admitted under Rule 107 of the Texas Rules of Evidence, the "optional completeness rule," because the State had "opened the door" to such testimony when Detective Dubose testified on direct that Brown had failed his polygraph test. Tex.R. Evid. 107. The optional completeness rule has been held applicable to references to polygraph tests. *Jannise v. State,* 789 S.W.2d 623 (Tex.App.-Beaumont 1990, pet. ref'd).

Long contends that the specific questions asked and the techniques employed by Kendricks, the polygraph expert, would demonstrate for the jury exactly how Brown had lied, particularly, "the jury may have been left with the false impression that Brown failed [the polygraph test] because he lied about excluding Appellant."

During the direct examination of Detective Dubose, the assistant district attorney asked him why he accompanied Brown to Houston. Dubose testified that, because Brown had failed his polygraph test, Dubose wanted to get more information from Long about Brown's potential involvement in the case. During the direct examination of Brown, the assistant district attorney inquired of Brown whether he had been given a polygraph test, to which Brown responded in the affirmative, and he further asked Brown if he had been told how he did on the test, to which Brown responded that he had failed it.

In certain limited instances under the rule of optional completeness, polygraph test results have been permitted to be introduced into evidence. Rule 107 of the Rules of Evidence provides that

> When part of an act, declaration, conversation, writing or recorded statement is given in evidence by one party, the whole on the same subject may be inquired into by the other, and any other act, declaration, writing or recorded statement which is necessary to make it fully understood or to explain the same may also be given in evidence, as when a letter is read, all letters on the same subject between the same parties may be given.....

Tex.R. Evid. 107.

In *Lucas v. State,* 479 S.W.2d 314 (Tex. Crim.App.1972), the Court of Criminal Ap-

peals recognized the predecessor of the quoted rule as allowing the prosecution to introduce evidence of the results of a polygraph examination given to the defendant after the defendant, testifying on his own behalf, stated that he had made an agreement with the district attorney that his case would be dismissed if he "passed" the polygraph test. The defendant testified in the same manner on cross-examination. On redirect he introduced a written motion for bond reduction, which had been previously filed by the district attorney and specifically referred to the agreement regarding the polygraph test. The agreement stated, "While the results were inconclusive in proving that Danny Lucas was completely innocent, they did indicate that he was not the person who assaulted the injured party . . . ." *Id.* at 315. Defendant further testified on redirect that he took a lie detector test and that the results of the test showed that he was not guilty and that the district attorney told him he did not believe he was guilty. Thereafter, the district attorney was called as a witness to testify that defendant *did not* pass the polygraph test. *Id.*

Citing the rule of optional completeness in effect at the time, the Court held: "Although the results from a polygraph test are ordinarily not admissible in evidence we conclude that under the particular facts of this case the appellant 'opened the door' for the State to introduce the complained of testimony." *Id.*[4] The "opening the door" rule applies with equal force to either the prosecution or the defense. *King v. State,* 773 S.W.2d 302, 307 (Tex.Crim. App.1989) (Teague, J., dissenting); *Parr v. State,* 557 S.W.2d 99 (Tex.Crim.App.1977).

The "opening of the door" in *Lucas* has been limited by subsequent opinions. While inadmissible evidence may be admitted if the party against whom the evidence is offered opens the door, the party offer-

ing the inadmissible evidence may not stray beyond the scope of the invitation. *Schutz v. State,* 957 S.W.2d 52, 71 (Tex. Crim.App.1997). For example, the use of specific statements from a polygraph examination for impeachment purposes, without revealing to the jury the source of the statements, did not permit, under the rule of optional completeness, the opposing party to disclose to the jury the results of the polygraph examination. *Hoppes v. State,* 725 S.W.2d 532, 535–36 (Tex.App.-Houston [1st Dist.] 1987, no pet.). The fact that a polygraph test is mentioned, without mentioning the results of that test, has been held not to be a "door opener" to further testimony by the opposing party as to the test's results. *Castillo v. State,* 739 S.W.2d 280, 293 (Tex.Crim.App.1987).

However, in this case, the *results* of the polygraph test given to Brown, the State's *key* witness, were mentioned several times to the jury, just as in *Lucas v. State,* without objection and without the jury being instructed to disregard. The jury was informed that Brown had not passed his lie detector test and that was the reason the police continued their investigation of his involvement in this matter. The results of the polygraph test were initially injected into the proceedings by a State's witness. Long then sought to introduce the expert who had administered the test, particularly to determine the questions that had been asked of Brown at the examination. At a hearing on a pretrial motion, Long called Kelly Hendricks, who operated an investigation and polygraph company in Humble, Texas. Detectives Ervin and Dubose requested that Hendricks conduct polygraph examinations of the Walgreens's employees in connection with the robbery/homicide. Because the robbery/homicide occurred at closing time at the Walgreens store, law enforcement officers wanted to

---

**4.** Regarding, generally, the rule of optional completeness, i.e., "opening the door" to otherwise inadmissible testimony. TEX.R. EVID. 107; *see Washington v. State,* 856 S.W.2d 184, 186 (Tex.Crim.App.1993); *Robinson v. State,*

550 S.W.2d 54, 59 (Tex.Crim.App.1977); *Streff v. State,* 890 S.W.2d 815, 819–20 (Tex. App.-Eastland 1994, no pet.); *Pinkney v. State,* 848 S.W.2d 363, 366 (Tex.App.-Houston [1st Dist.] 1993, no pet.).

give polygraph examinations to the employees who had been on duty that night to find out if they knew more than what they revealed in their initial interviews. The reason Brown was tested initially was because Detective Ervin found "inconsistencies" in certain statements Brown had made to law enforcement officers. Initially, Brown said that he was waiting outside for a ride after work and that Long drove by and picked him up.

In the pretrial hearing, Long's counsel questioned Hendricks as to how he developed the questions that were asked of the Walgreens's employees. In the course of examining Brown, Hendricks conducted a pretest interview in which Brown told him that Cedars had let him out of the store at the end of his shift on the night of the robbery/homicide. Kendricks then formulated what he referred to as his "primary exam sequence." First, a "numerical acquaintance test" was run in which Brown was asked to pick a number and tell the examiner that he did not pick that number, to test the witness's response to a known lie. In the pretest, Brown indicated "deception ... just like he was supposed to." The questions Hendricks initially asked of Brown were: 1) "Do you know who shot Mr. Cedars during the robbery?" 2) "Did you shoot the [assistant manager] of Walgreens during the robbery?" 3) "Were you inside Walgreens Friday night when the [assistant manager] was shot?" and 4) "Did you make plans with anyone to rob Walgreens?" Kendricks testified, according to the polygraph, Brown's "no" answers to all questions were deceptive. A follow-up examination was then administered, using different questions: 1) "Do you know something else about this case you are not telling us?" (Answer "NO"); 2) "When you left Walgreens Friday night, was Mr. Cedars still alive?" (Answer "YES"); 3) "Did you help anyone rob Walgreens?" (Answer "NO"); and 4) "When you returned to work Saturday, did you already know what happened?" (Answer "NO"). Kendricks testified that deception was also shown in Brown's answers to

these questions and that he tried to talk to Brown in an attempt to "resolve some of the deceptive problems, at which time he [Brown] offered no relevant explanations as to why deception was noted. . . ."

The State opened the door, or allowed it to be opened, with reference to not only the fact that a polygraph test had been administered, but to the *results* of that test. Detective Ervin testified that, based at least in part on the results of the polygraph test, Brown was advised that he was a major suspect in the homicide. Because of the unfavorable results of Brown's polygraph examination, Long was interviewed again to see if he had picked up Brown from in front of the Walgreens store, as Brown had told them. At the time of this interview, Detective Ervin testified that Long was not even a suspect.

Under the rule of optional completeness, therefore, Long should have been permitted to inquire into the specific questions asked at the polygraph examination. Had Brown been asked by the polygraph tester only about his knowledge of Long's participation in the robbery, and had he demonstrated deception in this regard, this would have provided support for Brown's eventual testimony implicating Long in the homicide. However, as shown by the testimony in the pretrial hearing, Brown also was shown by the test to have been deceptive in his answer to the' question "Did you [Brown] shoot the [assistant manager] ... ?" Without knowing the specific questions asked, a reasonable jury would have gotten a much different picture of the investigation than if the specifics of the actual questions on which Brown demonstrated deception were known. The jury could easily believe that Brown failed his test because he lied about Long's involvement in the murder.

The concept of an attorney "opening the door" to what would be otherwise inadmissible evidence is based on the fact that once one party has opened an inquiry into a particular subject, that party cannot

complain when the opposing party desires to go into the *details* of that subject. Evidence used to *fully explain* a matter opened up by the other party need not ordinarily be admissible. *King,* 773 S.W.2d at 307. The rule allowing the introduction of the entire writing, after part of the writing is used by one party, was meant to guard against the possibility of confusion, *distortion,* or *false impression* arising from the use of part of the writing. *Pinkney v. State,* 848 S.W.2d 363, 366 (Tex.App.-Houston [1st Dist.] 1993, no pet.).

The reasons why appellate courts have historically not permitted the introduction of polygraph evidence is due to the *inherent unreliability* of the evidence and its *tendency to be unduly persuasive.* Polygraph evidence has also generally been excluded due to potential sources of error in the test itself, including the incompetency of the examiner, *the tendency of the jury to place too much reliance on the test results,* and the difficulty for jury evaluation of the examiners' opinions. *Perkins v. State,* 902 S.W.2d 88, 92–93 (Tex.App.-El Paso 1995), *supplemented by* 905 S.W.2d 452 (Tex.App.-El Paso 1995, pet. ref'd).

By not permitting the defense to inquire regarding the specific questions asked of Brown by the polygraph examiner, the State has benefited unfairly from normally inadmissible, unduly persuasive evidence that was not fully explained. Long was also unfairly denied testimony that was favorable to his position, i.e., that Eddie Brown's "no" answer to the question of whether he (Brown) killed the assistant manager of Walgreens was found to be deceptive. Without such information, the jury was given a distorted or false impression as to the polygraph results, contrary to the well-established rule of law referred to above.

In *Patteson v. State,* 633 S.W.2d 549 (Tex.App.-Houston [14th Dist.] 1982, no pet.), the court of appeals recognized that inherently unreliable polygraph evidence should, once it has come into the case, at least be fully and accurately explained to the jury. *Id.* at 550–52. We hold that the trial court's ruling did not do so in this case, leaving the jury with a false or distorted impression of a very favorable piece of the State's evidence.

The State further argues that even if the polygraph questions should have been admitted, the error, if any, has to be disregarded because an erroneous ruling on the admission of evidence falls under TEX. R.APP. P. 44.2(b): "Any other [nonconstitutional] error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." A "substantial right" is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State,* 953 S.W.2d 266, 271 (Tex. Crim.App.1997); *Chisum v. State,* 988 S.W.2d 244, 251 (Tex.App.-Texarkana 1998, pet. ref'd). The Court in *King v. State* relied upon and cited as its authority *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

The majority opinion contends that failure to admit this evidence was harmless error and quotes from the record in an effort to demonstrate this point. It is true that the evidence points out that because Brown "failed his polygraph," the State focused on Brown as a suspect. But this evidence did not tell the jury that his involvement went so far as to show that he was the person who actually did the shooting. As stated by the majority in quoting the direct examination of Detective Dubose, Dubose testified that after Brown's polygraph, the police wanted to speak to Long again to find out what happened that night, if he had picked Brown up, *if Brown was outside,* where Brown was located, if Brown had anything with him, and what they had done. None of the testimony cited by the majority renders the error harmless by suggesting that Brown was the person who did the shooting. Dubose's testimony that he wanted to find out "if Brown was outside" suggests that Brown may have served as a lookout or

served in some other capacity, but not that Brown's involvement was some capacity other than being the shooter. The crucial polygraph results in this case, which Long sought to complete, was to show that Brown failed the polygraph test when he denied he was the shooter.

The trial judge ruled that the specific questions asked in the polygraph examination were irrelevant and cumulative of evidence already before the jury. The State argues, correctly, that there was already a large amount of evidence before the jury which attacked the credibility, generally, of Brown. Completion of polygraph results, however, does more than degrade Brown's general credibility. A false answer to the question as to whether Brown had killed the assistant manager of Walgreens is a direct implication of Brown as the individual who shot Cedars. The jury did not get to hear evidence that the State's star witness, who, having admitted and been shown to have lied about other aspects of the case, also failed the polygraph test when he said he was not the killer.

That evidence is potentially significant, because the trial court instructed the jury as follows: To warrant a conviction of the defendant of capital murder, you must find from the evidence beyond a reasonable doubt, not only on the occasion in question the defendant was engaged in the commission or attempted commission of the felony offense of robbery of John Cedars, but also during the commission of the robbery or attempted robbery thereof, if any, *the defendant shot John Cedars with the intention of killing him.* Unless you find from the evidence beyond a reasonable doubt that *the defendant, on said occasion, specifically intended to kill the said John Cedars* when he shot him, if he did shoot him, you cannot convict him of the offense of capital murder.

(Emphasis added.)

This is not a case built on the law of parties; the State is not trying to convict all persons present in a criminal situation without knowledge as to which individual actually committed the criminal act of capital murder. The charge is that Long specifically intended to kill Cedars in the course of a robbery or attempted robbery. The defense did not put the results of the polygraph examination into this case; this was done by the State's own witnesses. The results of Brown's polygraph examination were used to enhance the State's case. Yet, Long was denied his right under the rule of optional completeness to fully explain these results. Such explanation would have not only attacked generally the credibility of the State's key witness, but would have presented some evidence that this witness, and not Long, was the actual perpetrator of the offense charged. This had a substantial and injurious effect and influence in determining the jury's verdict.

I respectfully dissent.