# NO. 12-22-00103-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *EAGLE RAILCAR SERVICES, L.P., EAGLE RAILCAR SERVICES - ROSCOE, INC., EAGLE RAILCAR SERVICES - CAIRO, OHIO, LLC AND EAGLE RAILCAR SERVICES - WICHITA FALLS, TEXAS, LLC,* | § | *APPEAL FROM THE 3RD* |
| *APPELLANTS/CROSS-APPELLEES,* | § | *JUDICIAL DISTRICT COURT* |
| *V.* | | |
| *MATHESON TRI-GAS, INC., APPELLEE/CROSS-APPELLANT* | § | *ANDERSON COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Appellants Eagle Railcar Services, L.P. (Eagle Elkhart), Eagle Railcar Services – Roscoe, Inc. (Eagle Roscoe), Eagle Railcar Services – Cairo, Ohio, LLC (Eagle Cairo), and Eagle Railcar Services – Wichita Falls, Texas, LLC (Eagle Wichita Falls)[1] challenge the trial court's judgment in favor of Appellee, Matheson Tri-Gas, Inc. (Matheson), following a bench trial. In five issues, Eagle contends the trial court erred by (1) finding in favor of Matheson on its breach of contract counterclaim, (2) denying Eagle's breach of contract claim, (3) entering judgment in favor of Matheson on its declaratory judgment counterclaim, (4) denying Eagle's motion for a trial amendment, and (5) awarding Matheson "excessive and non-segregated attorney's fees[.]" Matheson filed a cross-appeal, in which it challenges (1) the trial court's failure to award Matheson damages as a lost volume seller and (2) the trial court's award of a lower amount of attorney's fees than Matheson requested. We affirm in part and reverse and remand in part.

---

[1] For clarity and brevity, we will refer to the Eagle entities collectively as "Eagle."

BACKGROUND

Eagle entered into seven product supply agreements with Matheson, pursuant to which Eagle agreed to purchase all of its "present and future requirements" of certain industrial gas products, as identified in Exhibit A to each agreement. Specifically, the contracts were for the following products and facilities: (1) packaged gases for Eagle Elkhart, including liquid argon, liquid CO2, liquid oxygen, liquid nitrogen, oxygen, propylene, nitrogen, argon, "argon/CO2[,]" and "TriMix HEL, ARG, CO2[,]" (2) bulk liquid nitrogen for Eagle Elkhart, (3) bulk liquid oxygen for Eagle Elkhart, (4) bulk nitrogen for Eagle Cairo, (5) bulk liquid oxygen for Eagle Roscoe, (6) bulk nitrogen for Eagle Wichita Falls, and (7) bulk oxygen for Eagle Wichita Falls. The contracts stated that Eagle agrees to purchase all the identified products "at the prices, charges and fees (aggregately, 'Prices'), set forth in Exhibit A."

Each agreement provided for an initial term of five years and would renew for successive terms unless either party received written notice of termination not less than twelve months before the term expired. Paragraph 5(a) of each agreement provided that Matheson had the right to increase its prices "[f]rom time to time" by giving Eagle written notice of the increase, and if Eagle did not provide Matheson with a competing bid, the price increase "shall become effective fifteen (15) days after the date of said notice" and the agreement "shall otherwise remain in full force and effect." Paragraph 5(a) also provided that notices "shall be sent by certified mail, return receipt requested." The contracts stated that if Matheson received a competing bid, Matheson had the option to either meet the lower price or rollback its price to the price that was in effect before the increase. Paragraph 5(c) provided that from time to time, Matheson "may need to recover for unusual or unexpected cost increases including, but not limited to, the costs of complying with [f]ederal, state and local regulations involving the storage, transportation, handling and/or disposal of hazardous materials, energy and/or fuel price changes, loss of local production facilities, raw material or commodity supply dislocations, and other similar events ("Surcharges")." However, Eagle Elkhart's contracts for bulk nitrogen and bulk oxygen, Eagle Cairo's contract for bulk nitrogen, Eagle Roscoe's contract for bulk oxygen, Eagle Wichita Falls's contract for bulk nitrogen, and Eagle Wichita Falls's contract for bulk oxygen all specifically provided in Exhibit A that the applicable surcharge is zero.

Paragraph 6 provided as follows: "Unless otherwise specifically prescribed in this [a]greement, any notices in connection herewith shall be sent by overnight mail or confirmed

facsimile transmission to the respective addresses" set forth in Exhibit A. Exhibit A of each agreement provided that "[i]n the event of any conflict between the terms and conditions of this Exhibit A and the Agreement, the terms and conditions of this Exhibit A shall prevail." Paragraph 12(a) provided that "[i]f a legal or equitable proceeding is instituted by [Matheson] against [Eagle] to enforce its rights and [Matheson] prevails, [Eagle] shall pay all of [Matheson]'s costs and expenses (including attorneys' fees)."

Matheson sent fourteen written notices of price increases to various Eagle locations, as follows: (1) notice dated November 16, 2015, sent to Eagle Elkhart and referring to Eagle Elkhart and Eagle Roscoe by account numbers as the affected accounts[2], stating that the price of bulk nitrogen and bulk oxygen would both increase by 5%; (2) notice dated December 17, 2015, sent to Eagle Roscoe and identifying Eagle Roscoe as the affected account, providing for a 10% delivery fee increase and a 5% increase in the price of "FG BK[;]"[3] (3) notice dated December 17, 2015, sent to Eagle Cairo, identifying Eagle Cairo as the affected account, and stating that the delivery fee would increase by 10% and "NI BK" would increase by 5%; (4) notice dated January 17, 2016, sent to Eagle Roscoe, identifying Eagle Roscoe by account number as the affected account, and providing for a 15% increase on "liquid tank[;]" (5) notice dated November 15, 2016, sent to Eagle Elkhart and referring to Eagle Roscoe and Eagle Cairo as the affected accounts, stating that the price of bulk nitrogen ("NI BK") would increase by 10%, bulk oxygen ("OX BK") would increase by 5%, "vessel rental" would increase by 10%, and delivery fee would increase by 10%; (6) notice dated December 18, 2016, sent to Eagle Wichita Falls and referring to Eagle Wichita Falls's account number, stating that the price of nitrogen would increase by 10% and the price of oxygen would increase by 10%; (7) notice dated June 26, 2017, sent to Eagle Elkhart, identifying the affected accounts as Eagle Elkhart (packaged), Eagle Elkhart (bulk), and Eagle Wichita Falls, and providing that the price of "ALL packaged gas" would be increased by 15%; (8) notice dated June 26, 2017, sent to Eagle Cairo and identifying the affected account as Eagle Cairo, providing that the price of nitrogen would increase by 15% and the delivery fee would be

---

[2] The evidence at trial showed that the parties used five account numbers for the Eagle entities' accounts with Matheson: (1) "P1234" for Eagle Wichita Falls, (2) "M4315" for Eagle Elkhart (bulk), (3) "63777" for Eagle Roscoe, (4) "Q2775" for Eagle Cairo, and (5) "C0175" for Eagle Elkhart (packaged).

[3] The record does not explain what product is indicated by "FG BK." Eagle states in its brief that it could not ascertain the product to which the notice referred. Eagle Roscoe's contract was solely for bulk oxygen, but there is no indication that "FG BK" indicated bulk oxygen. Other documents in the record that refer to oxygen either spell out "oxygen" or use the initials "OX."

increased by 10%; (9) notice dated June 26, 2017, sent to Eagle Elkhart and identifying the affected accounts as Elkhart (packaged), Elkhart (bulk), and Eagle Wichita Falls, providing that the price of nitrogen would increase by 15%, the price of oxygen would increase by 15.38%, the delivery fee would increase by 10%, and "Equipment Rental" would increase by 10%; (10) notice dated March 26, 2018, sent to Eagle Cairo, and stating that the following energy surcharges would be levied "due to record cold temperatures in the Northeastern United States in January of 2018: "$0.1645/ccf delivered" for bulk liquid oxygen, "$0.1645/ccf" delivered for bulk liquid nitrogen, and "$0.3295/ccf delivered" for bulk liquid argon, covering "the period January 1, 2018 through January 31, 2018[;]" (11) notice dated November 15, 2018, sent to Eagle Elkhart and identifying the affected accounts as Eagle Roscoe, Elkhart (packaged), Elkhart (bulk), Eagle Wichita Falls, and Eagle Cairo, and stating that the price of nitrogen would increase by 15%, the price of oxygen would increase by 15%, delivery fee would increase by 10%, and "Facility Fee" would increase by 10%; (12) notice dated December 21, 2018, sent to Eagle Elkhart and identifying the affected account as Eagle Wichita Falls, stating that the "Facility Fee" would increase by 10%; (13) notice sent to Eagle Elkhart, dated January 14, 2019, which did not identify any specific accounts by name or number, stating that due to "an exceptional surge in demand for commercial drivers without a commensurate supply available" a nationwide driver shortage occurred, and "to reliably supply our customers, MATHESON has implemented a Driver Availability Charge that began appearing on your invoices starting 12/14/2018[;]" and (14) notice dated May 16, 2019, sent to Eagle Elkhart and identifying the affected account as Eagle Wichita Falls, stating that the "Facility Fee" would increase by 10% and the delivery fee would increase by 10%.

Eagle eventually filed a declaratory judgment action against Matheson, in which Eagle sought a declaration of its rights as to the product supply agreements. Specifically, Eagle asked for a declaration of (1) the validity of Matheson's price increases pursuant to Paragraph 5(a) of the agreements, (2) the meaning of the phrases "bona fide firm written offer" and "responsible producer," (3) "the impossibility of Eagle's compliance," (4) the unconscionability of the price increases, term and term renewal provisions, and price revision provisions, (5) the correct amounts due under the agreements, if any, and (6) Eagle's ability to terminate the agreements. According to Eagle, Matheson "systematically attempted to force a number of unwarranted and unlawful price increases and charges on Eagle[,]" and Eagle asserted that the price increases were "retaliatory and unconscionable."

4

Eagle conceded that it received each of the written notices, but contended that numerous notices were ineffective because they were not sent to the address or particular person specified in the agreements, they were not sent via the method of delivery set forth in the agreements, or they did not contain the information specified in the agreements. In addition, Eagle asserted that Matheson breached the agreements by wrongfully refusing to continue supplying gases to Eagle. Matheson filed a counterclaim, in which it argued that it supplied products for which Eagle did not pay. In addition, Matheson contended that Eagle Cairo breached the agreements by purchasing products from a third-party supplier, and Matheson maintained that it either tendered performance or was excused from performing its contractual obligations. Moreover, Matheson asserted a counterclaim for declaratory relief, in which it asked the trial court to construe the price adjustment provision in Paragraph 5 of the agreements. Matheson also sought declarations that (1) Eagle received actual and legally binding notice of the price adjustments, (2) Eagle failed to furnish Matheson with a bona fide written offer from a responsible supplier of the products that were subject to price adjustments, (3) the price adjustments were effective, and (4) the amounts to be paid under the agreements were the prices as increased by the price adjustments. Matheson sought attorney's fees pursuant to Chapters 37 and 38 of the Texas Civil Practice and Remedies Code, as well as Paragraph 12(a) of the agreements.

Before trial began, Matheson filed a request for the trial court to take judicial notice that Eagle physically received the price increase notices, and the trial judge noted in its findings of fact that Eagle "did not oppose the request and even admitted" receiving the notices. The trial court took judicial notice as Matheson requested, and the case proceeded to a bench trial.

Casey Clark, Eagle's corporate purchasing manager for all of its locations, testified that he negotiated the pricing, payment terms, and term length of the agreements between Eagle and Matheson for Eagle Elkhart, and he later became familiar with additional agreements pertaining to Eagle's Roscoe, Wichita Falls, and Cairo locations. Clark explained that the agreements are identical except for the product for which they are written. Clark testified that although Paragraph 6 of the agreements required notices to be sent to certain addresses by overnight mail or confirmed facsimile transmission, none of Matheson's price increase notices were sent via overnight mail or facsimile. In addition, Clark stated that some of Matheson's price increase notices were sent to the wrong address. According to Clark, Matheson's Southeast Texas Regional Manager, Richard Runnels, handled price increases.

Clark testified that in January 2014, he received an email from Matheson, which stated, "Eagle Railcar has a total of $37,297.58 that is due from Matheson for overages." Clark testified that the email referred to "charges charged to us over the terms of the contract and without . . . proper price increase notices." Clark explained that in September 2016, he decided to take Eagle Elkhart's business away from Matheson and give it to another supplier, and Runnels subsequently sent him an email which stated, "As per our conversation on 9/8/2016 we will rollback gas prices to original contract pricing set on . . . 4/15/13. Any future increases we will give notification per contract details." Clark testified that Runnels's email "relates to multiple phone conversations . . . about price increases" that were not sent in accordance with the terms of the agreements. Clark explained that he believed the email meant Matheson was committing to send future price increase notices "as originally agreed on in the contract, and in exhibit A of each contract[,]" and Clark believed the email applied to all of Eagle's agreements with Matheson, including agreements that did not yet exist on April 15, 2013.

According to Clark, Matheson continued to send notices by the wrong delivery method, and the notices contained incorrect account numbers, incorrect product descriptions, or were sent to the wrong address. When asked what the "Facility Fee" is that appeared in the price increase notices Matheson sent on November 15, 2018, and December 2018, Clark testified that neither Eagle Cairo's contract nor Eagle Wichita Falls's contract contains any reference to a facility fee. During cross-examination, Clark testified that he ultimately received all of the price increase notices. Clark understood that he had fifteen days after receiving the notices to obtain quotes from third parties. Clark testified that although Eagle obtained quotes from third party suppliers, Eagle never sent them to Matheson, in part because Eagle did not want the contracts to renew. Clark did not recall emailing Matheson regarding Eagle's issues with how or to whom Matheson sent the price increase notices, but he participated in "multiple phone calls" with Runnels and other Eagle employees about the notices.

Clark testified that Matheson engaged in overbilling and overstocking, and he complained that the notices of price increases were "[n]ot being sent per terms of the contract[.]" According to Clark, Eagle continued to pay for the products it received from Matheson. Eagle stopped paying the increased prices after an employee in accounts payable notified Clark that Matheson was charging Eagle "more than the original contracted price, and it was brought to my attention then, because not all these notices were sent to the addresses they were supposed to be sent to on price

increases." Clark admitted that Eagle short paid Matheson's invoices. Clark explained that Matheson placed Eagle Cairo on a credit hold on September 17, 2018, and ceased deliveries on September 24, 2018. According to Clark, Eagle Cairo eventually obtained gas products from a third party. Clark testified that in August 2019, Eagle took over its DuBois, Pennsylvania location from Rescar Companies (Rescar) after buying Rescar's assets, and Eagle accepted deliveries Matheson made to DuBois. Matheson read into evidence a portion of Clark's deposition, in which Clark testified to asking Matheson to send the DuBois invoices to Eagle and stated that Eagle "probably would" pay such invoices.

Runnels testified that he dealt with Clark regarding Eagle Elkhart's account, and he indicated that they spoke on the telephone and corresponded by email. Runnels explained that Clark was unhappy about Matheson's price increases. Runnels rolled back Eagle Elkhart's prices with the approval of his superior, who was Matheson's zone vice president. Runnels testified that the agreements gave Matheson the opportunity to match a competing bid or to roll back prices. According to Runnels, Clark took issue with the price increases but never complained about the means by which Eagle received notification of the increases. Runnels explained, "[Clark] wasn't coming to me saying I didn't get the right notification[.] [H]e was coming to me saying man[,] these prices are going up again." Runnels agreed that when he emailed Clark in 2016, he knew that Clark and Eagle had objected to the "method" by which price increases were previously provided, and he explained that he intended to roll back prices only for the packaged gas division at Elkhart.

During re-direct examination, Runnels testified that Clark complained about the fact that the price was increasing, not the means of delivering the price increase notices or the addresses to which they were sent. Runnels knew Clark received the price increase notices "because he was complaining about them." When Runnels sent the September 2016 email to Clark, Clark had already complained that a previous Matheson salesperson did not provide any notice of the price increase; that is, Clark complained about lack of any notice, not the sufficiency of Matheson's notices. Runnels stated that when Clark received the price increase notice of November 15, 2016, he complained about the prices but did not mention the method by which the notice was sent. When asked whether he had the authority to sign contracts for Matheson, Runnels testified, "I have to get it approved. All of them go through legal." Runnels explained that he lacks authority to change contracts.

Richard Lauck, Matheson's regional sales manager for bulk gases, testified as Matheson's corporate representative. Lauck explained that Matheson routinely sends price increase notices to all of its customers by U.S. mail rather than by overnight mail or confirmed facsimile. Lauck testified that Matheson asserted a claim against Eagle Elkhart for products delivered to Eagle's DuBois location because Eagle Elkhart acquired the DuBois location from Rescar. However, Lauck also testified that he is unaware of any agreement by Eagle Elkhart to accept responsibility for products delivered to DuBois. According to Lauck, Matheson eventually ceased making deliveries to all of Eagle's locations.

Lauck testified that Matheson would have received $17,135.52 in gross revenue from Eagle if Eagle continued to purchase its nitrogen from Matheson rather than a third party, and Matheson would have received profits of $58,574.77. Lauck explained that Matheson can supply bulk liquid nitrogen to numerous customers simultaneously, and Matheson would have also continued to supply nitrogen to Eagle if Eagle had paid Matheson's invoices. Lauck testified that Eagle purchased its DuBois location from Rescar, and Air Liquide, which Matheson ultimately acquired, was supplying gas to Rescar at the time of the purchase. According to Lauck, Matheson continued to provide gas to DuBois, and Clark instructed Matheson to send the invoices for the gas supplied to DuBois to him at Eagle Elkhart.

Marc Walraven, Eagle's president and general counsel, testified that each Eagle location is a separate entity. He explained that Eagle acquired some of the assets of Rescar. According to Walraven, Eagle Railcar Services – DuBois, Pennsylvania, LLC purchased five Rescar plant locations, but the transaction excluded all leases, rental agreements, contracts, vendor agreements, and customer agreements. Walraven stated that the acquisition of the DuBois facility "specifically excluded all assets other than land, tools, and equipment[,]" and he testified that Eagle Elkhart never owned the properties purchased from Rescar. When asked whether he denied that Eagle Elkhart, Eagle Roscoe, Eagle Cairo, and Eagle Wichita Falls were liable to Matheson for products delivered to DuBois, Matheson's counsel objected that Eagle did not plead a defect of parties as required by Rule 93 of the Texas Rules of Civil Procedure. Eagle's counsel sought a trial amendment, both orally and in a written motion.

Walraven testified that Matheson's price increase notices contained multiple "failures[,]" including improper location of delivery, improper method of delivery, failure to identify the proper Eagle entities, and failure to identify the proper account numbers and products. Walraven

described the notices as "fraught with errors." Walraven opined that "when Matheson failed to satisfy its conditioned method of delivery, time allotted, correct address, correct proper identification, [and] correct client name, . . . the trigger never occurred for a valid price increase[;] therefore, there was no obligation on Eagle to go out and get competitive pricing." According to Walraven, Eagle determined "early on" that the attempted price notices were insufficient.

Walraven stated that in January 2014, Matheson agreed to "repay just over $37,000 in these overcharges due to the ineffective price increase notifications." In addition, Walraven testified that in 2016, Matheson "acknowledged" that it was charging Eagle "in excess of what the contract called for[,]" so Matheson agreed to roll back its prices. Walraven explained that Eagle relied on Matheson's statements in interpreting the requirements of Paragraph 6 of the agreements. According to Walraven, Matheson "agreed twice . . . that [it] was improper to send them by regular mail, and they weren't in accordance [with] the contract. One time [Matheson] refunded money and one time agreed to rollback … prices and committed to follow the contract in the future." Walraven testified that Clark was not authorized to sign contracts on behalf of Eagle without the consent of a superior.

Walraven believed Matheson was attempting to strong-arm Eagle by increasing prices in retaliation for Matheson's loss of Eagle's bin stock account. Walraven testified that Eagle relied on Runnels's 2016 email to Clark. Walraven did not specifically point out that price increases were being sent by U.S. mail, to the wrong address, or were not being sent by facsimile, and he stated that Eagle received the notices. He stated that Matheson's tank was on site when Eagle purchased Rescar's DuBois location, and that Clark asked for invoices to be sent to him at Elkhart on behalf of "Eagle DuBois." Walraven explained that Clark worked on behalf of Eagle DuBois. Walraven stated that at his deposition, he testified that Eagle should pay for the gas it used at the DuBois location at an agreeable rate, and he asked Matheson to invoice Eagle.

The trial court signed a judgment awarding Matheson damages as follows: (1) $81,431.45 from Eagle Elkhart, (2) $39,068.68 from Eagle Roscoe, (3) $35,346.42 from Eagle Wichita Falls, and (4) $7,494.65 from Eagle Cairo. The trial court also declared that "Eagle received actual and legally-binding notice of the price increase notices" and ordered that Eagle take nothing on its claims. Eagle filed a motion for new trial. The trial court subsequently filed findings of fact and conclusions of law, and the record does not reflect that Eagle challenged the findings of fact and conclusions of law. The trial court denied Eagle's motion for new trial, and this appeal followed.

In issue one, Eagle asserts that the trial court erred by finding in favor of Matheson on Matheson's breach of contract counterclaim.

**Standard of Review and Applicable Law**

In a bench trial, the trial court, as factfinder, is the sole judge of the credibility of the witnesses and the weight to be assigned to their testimony. *See Canal Ins. Co. v. Hopkins*, 238 S.W.3d 549, 557 (Tex. App.—Tyler 2007, pet. denied) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005)). The trial judge is free to believe one witness and to disbelieve another, and a reviewing court may not impose its own opinion to the contrary. *Id*. Therefore, we must assume that the factfinder decided all credibility questions in favor of its finding if a reasonable person could do so. *Id*. If a reasonable factfinder could have done so, we must assume that the factfinder chose what testimony to disregard in a way that favored its ruling. *Id*.

**Analysis**

Within its multifarious first issue regarding the trial court's judgment in favor of Matheson on its counterclaim for breach of contract, Eagle asserts that (1) Matheson did not substantially comply with the agreements' notice provisions, (2) Matheson did not plead the theory of substantial performance as a ground for affirmative relief, (3) Matheson was not entitled to rely on the equitable remedy of substantial performance, (4) the trial court incorrectly relied upon cases involving substantial compliance, (5) the evidence is legally and factually insufficient to demonstrate that Eagle breached the agreements, (6) Matheson entered into accord and satisfaction agreements with Eagle in 2014 and 2016, and (7) the evidence is legally and factually insufficient to support the trial court's award of damages against Eagle Elkhart for gases Matheson delivered to DuBois, Pennsylvania.[4]

*Substantial Compliance*

We turn first to Eagle's argument that Matheson failed to comply with the notice provisions of the agreements.[5] In *James Construction Group, LLC v. Westlake Chemical Corporation*, 650

---

[4] With respect to issue one, Eagle's arguments in the body of its brief differ somewhat from those in the "Issues Presented" section of its brief. We will address the more detailed arguments Eagle made in the body of its brief.

[5] In its conclusions of law, the trial court found that "[t]o the extent Eagle argues that Matheson failed to strictly comply with the notice provisions, under Texas law[,] Matheson's substantial compliance with the notice provisions is sufficient."

S.W.3d 392 (Tex. 2022), the Texas Supreme Court adopted a substantial compliance test for contractual notice provisions. *James* involved a construction contract dispute, in which both parties contended that the other breached the agreement. *Id*. at 396. Specifically, James Construction Group (James) asserted that Westlake Chemical Corporation (Westlake) failed to comply with contractual notice requirements, which were conditions precedent. *Id*. at 404. Under the terms of the contract, if Westlake determined that there were serious safety violations, it could terminate the contract upon giving James three notices in writing: (1) notice that there were serious safety violations, which would trigger a seventy-two-hour window for James to begin remedying the violations; (2) notice that Westlake was not reasonably satisfied with the pace and quality of James's remediation effort, and (3) notices that Westlake elected to terminate the contract. *Id*. at 398.

The Texas Supreme Court held that "substantial compliance is the appropriate standard when evaluating whether a party complied with a contractual notice provision[,]" but "substantial compliance with a condition precedent requiring written notice may not be achieved without a writing in some form." *Id*. at 405. In so holding, the Court noted that a party's "minor deviations from a contractual notice condition that do not severely impair the purpose underlying that condition and cause no prejudice do not and should not deprive that party of the benefit of its bargain." *Id*. at 406. The Court explained that notice can be untimely, sent in the wrong manner, or deficient and still be effective. *See id*. at 405-06. Moreover, the Texas Supreme Court explained that the doctrine of substantial compliance "serves the important purpose of preventing parties from engaging in bad-faith 'gotcha' tactics to avoid their own contractual obligations based on a technicality." *Id*. at 406.

The Texas Supreme Court issued its decision in *James* after the trial court signed its judgment and filed findings of fact and conclusions of law in the instant case. In its conclusions of law, the trial court expressly considered and discussed *Texas Utilities Electric Company* and *Barbier*,[6] which were two of the substantial compliance cases discussed by the Texas Supreme Court in *James*. *See id*. As the Texas Supreme Court explained, *Barbier* involved written notice that was not sent by registered mail as required by the contract, and *Texas Utilities Electric Company* involved a notice that was sent to the office of an authorized agent in Mesquite, Texas,

---

[6] *Tex. Utils. Elec. Co. v. Aetna Cas. & Sur. Co.*, 786 S.W.2d 792 (Tex. App.—Dallas 1990, writ denied); *Barbier v. Barry*, 345 S.W.2d 557 (Tex. App.—Dallas 1961, no writ).

despite the requirement that written notice be sent to Allen, Texas, and the agent received the notice. *Id*. at 406. In both cases, the Dallas Court of Appeals determined that there was substantial compliance with the contractual notice provisions. *Tex. Utils. Elec. Co. v. Aetna Cas. & Sur. Co.*, 786 S.W.2d 792, 794 (Tex. App.—Dallas 1990, writ denied); *Barbier v. Barry*, 345 S.W.2d 557, 562 (Tex. App.—Dallas 1961, no writ). The Texas Supreme Court expressly stated that it agreed with the reasoning of the Dallas Court of Appeals in *Texas Utilities Electric Company* and *Barbier*. *James Constr. Grp*., 650 S.W.3d at 406.

It is undisputed that some of the written notices Matheson sent to Eagle were not made by the means of delivery specified in the agreements or were not sent to the address or particular person specified in the agreements. At trial, Clark testified that he ultimately received each of the notices. Moreover, as discussed above, the trial court took judicial notice that Eagle received each of the written notices of price increases. We conclude that, as in *James*, Matheson's minor deviations from the agreements' notice provisions did not severely impair their purpose, nor was Eagle prejudiced by the deviations as to the following price increase notices, which clearly identified by account number the affected facility or facilities and pertained to products, prices, and charges that were included in the agreements, and were sent either to the affected facility or to Eagle Elkhart, where Clark offices: (1) notice pertaining to Eagle Elkhart (bulk) and Roscoe, dated November 16, 2015; (2) notice pertaining to Eagle Roscoe, dated December 17, 2015, solely to the extent that it increased the delivery fee by 10%; (3) notice pertaining to Eagle Cairo, dated December 17, 2015; (4) notice pertaining to Eagle Roscoe, dated January 17, 2016; (5) notice pertaining to Eagle Roscoe and Eagle Cairo, dated November 15, 2016, to the extent that it provided for increases in the price of nitrogen and oxygen for Eagle Cairo and Eagle Roscoe, as well as a 10% increase in the delivery fee for Eagle Roscoe; (6) notice pertaining to Eagle Wichita Falls, dated December 18, 2016; (7) notice pertaining to Eagle Elkhart (both packaged and bulk) and Eagle Wichita Falls, dated June 26, 2017; (8) notice pertaining to Eagle Cairo, dated June 26, 2017; (9) notice pertaining to Eagle Elkhart (packaged), Eagle Elkhart (bulk), and Eagle Wichita Falls, dated June 26, 2017, solely to the extent that it provided for a 15% increase in the price of nitrogen, 15.38% increase in the price of nitrogen, and a 10% increase in the delivery fee; and (10) notice pertaining to Eagle Roscoe, Eagle Elkhart (packaged), Eagle Elkhart (bulk), Eagle Wichita Falls, and Eagle Cairo, to the extent that it provided for a 15% increase in the price of nitrogen, a 15% increase in the price of oxygen, and a 10% increase in the delivery fee; and (11) the notice

pertaining to Eagle Wichita Falls, dated May 16, 2019, solely to the extent it provides for a 10% increase in the delivery fee. *See id*. at 405-06. Accordingly, we further conclude that Matheson substantially complied with the contractual notice provisions as to said price increase notices. *See id*.

We conclude, however, that several of the notices of price increases, or portions thereof, did not substantially comply with the contracts' notice provisions. First, the notice pertaining to Eagle Roscoe, dated December 17, 2015, purported to increase the price of a product identified as "FG BK" by 5%; however, the record does not demonstrate to what product "FG BK' referred, and Eagle Roscoe's contract was solely for bulk oxygen. We therefore conclude that the notice regarding an unidentified product to which the contract did not pertain did not substantially comply with the notice provision. *See id*. Second, the notice pertaining to Eagle Roscoe and Eagle Cairo, dated November 15, 2016, purported to increase the price for "vessel rental" by 10%. However, the contracts for Eagle Roscoe and Eagle Cairo did not reference a vessel rental charge. In addition, Eagle Cairo's agreement specifically stated that the system was a customer-owned vessel. Moreover, Exhibit A of Eagle Cairo's contract expressly provided that the delivery fee would be "$0.00" We therefore conclude that said price increase notice did not substantially comply with the notice requirements with respect to the vessel rental charge as to Eagle Roscoe and Eagle Cairo, and it further did not substantially comply as to the purported delivery fee increase of 10% for Eagle Cairo.

Third, the notice pertaining to Eagle Elkhart (packaged), Eagle Elkhart (bulk), and Eagle Wichita Falls, dated June 26, 2017, purported to increase "Equipment Rental" by 10%. Exhibit A to Eagle Elkhart's contract for packaged gases contains a manifold rental fee, but the notice does not specify whether the proposed "Equipment Rental" fee applied to the manifold rental or rental of another, unspecified item. Moreover, neither Exhibit A of the bulk contracts for Eagle Elkhart or Exhibit A of Wichita Falls's contract referred to any rental fee. Therefore, we conclude that said notice regarding an equipment rental fee did not substantially comply with the agreements' notice provisions; however, as discussed above, the remaining price increases contained within that notice substantially complied with the notice provisions. *See id*. Fourth, the notice pertaining to Eagle Cairo, dated March 26, 2018, purported to impose a "one-time" surcharge for the period of January 1, 2018, through January 31, 2018, on bulk liquid oxygen, bulk liquid nitrogen, and bulk liquid argon due to "record cold temperatures" and "exceptional energy costs." However, Exhibit

13

A of Eagle Cairo's contract explicitly stated that the surcharge would be zero, and the contract states that Exhibit A controls if there is a conflict between Exhibit A and the body of the contract. We therefore conclude that said notice did not substantially comply with the contract. *See id*.

Fifth, the notice pertaining to Eagle Roscoe, Eagle Elkhart (packaged), Eagle Elkhart (bulk), Eagle Wichita Falls, and Eagle Cairo, dated November 15, 2018, purported to increase a "Facility Fee" by 10%. None of the affected contracts or Exhibit A thereof contained any reference to a facility fee. Therefore, we conclude that said notice regarding a facility fee did not substantially comply with the agreements' notice provisions, but as explained above, the remaining charges did substantially comply.[7] *See id*. Sixth, the notice pertaining to Eagle Wichita Falls, dated December 21, 2018, likewise refers to a "facility fee," yet Wichita Falls' contract does not contain any reference to a facility fee. Seventh, the notice sent to Eagle Elkhart, dated January 14, 2019, purports to impose a driver availability charge on invoices "starting 12/14/2018." Said notice does not identify the Eagle facilities or accounts to which it applies, and it does not state an amount of the purported charge, either by percentage or dollar amount. We therefore conclude that said notice does not substantially comply with the requirements of the agreements. *See id*. Lastly, the notice pertaining to Eagle Wichita Falls, dated May 16, 2019, purports to increase the facility fee by 10% and the delivery fee by 10%. Because Eagle Wichita Falls's contract does not refer to a facility fee, the notice letter did not substantially comply with the notice requirements of the agreement as to increasing a facility fee. *See id*.

Eagle asserts that Matheson only pleaded substantial compliance as a defense; that is, Eagle contends Matheson did not assert the doctrine as a basis for affirmative relief in its counterclaim. Eagle also maintains that Matheson may not rely on the equitable doctrine because Matheson willfully departed from the notice provisions. We disagree. In support of its arguments, Eagle cites ***Smith v. Smith***, 112 S.W.3d 275 (Tex. App.—Corpus Christi 2003, pet. denied). In ***Smith***, the appellant contended that the trial court erred by determining that the defensive theory of substantial performance defeated her breach of contract claim. *Id*. at 278. The ***Smith*** court explained that the doctrine of substantial performance "allows a party to bring a contract action to recover the full performance price, less the cost of remedying those defects that can be fixed[,]" and it may also

---

[7] Eagle Cairo's contract specifically stated that the delivery fee is $0.00. Accordingly, although the remainder of the notice facially complies with the contract, the notice did not increase Eagle Cairo's delivery fee because 10% of zero is zero.

14

be used as a defense to a breach of contract claim." ***Id***. at 278-79. The ***Smith*** Court noted that "[i]n determining substantial performance, there must be no wil[l]ful departure from the terms of the contract and no omission of essential points of the project[]" and held that the party seeking relief under the doctrine bears the burden of proving that he substantially performed in accordance with the agreement. ***Id***. at 279. In ***Garcia v. Kastner Farms, Inc.***, 789 S.W.2d 656 (Tex. App.—Corpus Christi 1990, no writ), which the ***Smith*** court cited, the Court of Appeals held that with respect to building or construction contracts, substantial performance is an equitable doctrine which modifies the strict rule that a party who is in default under a contract cannot maintain a suit for breach of contract. ***Garcia***, 789 S.W.2d at 660; see Smith, 112 S.W, 3d at 280.

In its reply brief, Eagle asserts that substantial compliance and the substantial performance doctrine are "distinct yet equivalent doctrines of equity." We disagree that the doctrines are equivalent. The instant case does not involve building or construction contracts, and neither party is a building contractor. We conclude that substantial compliance, as set forth by the Texas Supreme Court in ***James***, is different than the substantial performance doctrine at issue in ***Smith***. This is evidenced by the Court's conclusion in ***James*** that "substantial performance" is a "distinct doctrine" that allows a contractor who has substantially performed a building contract to recover the full contract price minus the cost of remedying defects that are remediable, and the Court's explanation that its decision "does not address the application of that doctrine when the *contractor* fails to comply strictly with an express condition requiring written notice." ***James Constr. Grp.***, 650 S.W.3d at 405 n.14 (emphasis added). Because we conclude that the equitable doctrine of substantial performance is inapposite in the case at bar, we likewise conclude that the "willful departure" test discussed in ***Smith*** does not apply. Furthermore, because the doctrine of substantial performance is inapposite, Matheson need not have pleaded the doctrine in its counterclaim. *See id.*; ***Smith***, 112 S.W.3d at 279-80.

<u>Whether Eagle Breached the Agreements</u>

Eagle argues that the evidence is legally and factually insufficient to demonstrate that it breached the agreements because (1) Matheson's provision of notices in compliance with the

15

agreements was a condition precedent to Eagle's obligation to pay the increased prices and (2) Matheson's refusal to continue supplying gases to Eagle Cairo constituted a material breach.[8]

We first address Eagle's contention that Matheson's provision of notice in compliance with the agreements was a condition precedent to its obligation to pay Matheson's increased prices. This argument appears to be a restatement of its previous arguments regarding substantial compliance; that is, Eagle seems to argue that Matheson's provision of notice in strict compliance with the agreements was a condition precedent to its recovery of damages from Eagle for breach of contract. Eagle cites *James* for the proposition that the notice provisions were conditions precedent, *i.e.*, events that must happen or be performed before a right to enforce an obligation accrues. *James Constr. Grp.*, 650 S.W.3d at 415. We have no quarrel with that proposition; however, Eagle's argument ignores the Texas Supreme Court's substantial compliance analysis in *James*. As discussed above, the condition precedent regarding notice was satisfied by Matheson's substantial compliance as to many of the price increase notices, and the trial court did not err by so concluding as to the notices discussed above. *See id.* at 404-06.

With respect to the notices or portions of notices for price increases not allowed under the agreements (i.e. notices purporting to impose facility fees, equipment rental fees, vessel rental charges, a cold weather-related surcharge, and driver availability charges), said notices were ineffective to increase the price or to impose the purported fees and charges. A condition precedent is an event that must happen before a right can accrue to enforce an obligation, and if an express condition is not satisfied, then the party whose performance is conditioned is excused from performance. *Id*. at 415. We conclude that under the terms of the agreements, Matheson's substantial compliance with the notice provisions was a condition precedent to recovering damages, and Eagle therefore did not breach the agreements by refusing to pay facility fees, equipment rental fees, vessel rental fees, a cold weather-related surcharge, and driver availability charges. *See id*. at 404-06, 415.

We turn now to Eagle's contention that Matheson materially breached the agreement by refusing to continue providing gas products to Eagle Cairo, "thereby relieving Eagle Cairo of its exclusivity obligation." "Texas courts regularly enforce unambiguous contract language agreed to

---

[8] Eagle does not discuss the standards of review for legal and factual sufficiency of the evidence or explain how the evidence was insufficient. *See* TEX. R. APP. P. 38.1(i). Rather, Eagle conflates the concepts of evidentiary sufficiency and contract construction. We limit our review to the specific arguments before us.

by sophisticated parties in arms-length transactions." *Id*. at 403. A breach of a contract occurs when a party fails or refuses to do something it has promised to do. *B & W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 16 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *XCO Prod. Co. v. Jamison*, 194 S.W.3d 622, 632 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

As discussed above, Eagle Cairo's agreement with Matheson was a requirements contract. Except as to the one-time cold weather surcharge discussed above, Matheson substantially complied with the agreement's notice provision pertaining to price increases, and the increased prices therefore went into effect. Paragraph 7 of the agreement unambiguously provided that if Eagle Cairo breached "any of its duties or obligations[,]" Matheson could cease making deliveries to Eagle. It is undisputed that Eagle Cairo began short paying Matheson's invoices due to the parties' dispute regarding the price increases. Matheson notified Eagle Cairo that it would cease deliveries due to Eagle Cairo's refusal to pay Matheson's invoices in full and did so. After Matheson ceased deliveries, Eagle Cairo entered into a contract with a third party. We conclude that because Matheson substantially complied with all the notice provisions except as to the cold weather surcharge and the increased prices went into effect, the contract unambiguously permitted Matheson to cease deliveries. Therefore, Matheson's cessation of deliveries did not constitute a breach of contract that excused Eagle from further performance under the agreement. *See James Constr. Grp.*, 650 S.W.3d at 403-05; *Beckman*, 305 S.W.3d at 16; *Jamison*, 194 S.W.3d at 632.

### Accord and Satisfaction

Eagle contends that emails from Matheson in January 2014 and September 2016 constituted an accord and satisfaction. Eagle argues that it relied on the representations in the emails and continued to believe that Matheson's price increase notices were "inherently ineffective."

An "accord" is a new contract to discharge an existing obligation, and "satisfaction" is the performance of the new contract. *Honeycutt v. Billingsley*, 992 S.W.2d 570, 576-77 (Tex. App.—Houston [1st Dist.] 1999, pet. denied). As the party asserting the affirmative defense of accord and satisfaction, Eagle bore the burden to conclusively establish accord and satisfaction as a matter of law. *See Richardson v. Allstate Tex. Lloyd's*, 235 S.W.3d 863, 865 (Tex. App.—Dallas 2007, no pet.). "To prevail on a defense of accord and satisfaction, a party must prove the existence of a new contract, express or implied, whereby the parties agree to discharge the existing obligation by payment of a lesser amount." *Boland v. Mundaca Inv. Corp.*, 978 S.W.2d 146, 148 (Tex. App.—

Austin 1998, no pet.). Courts must give contract terms their plain, ordinary, and generally accepted meaning unless the contract shows that they were used in a technical or different sense. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005).

Paragraph 12(b) of the agreements contains an integration clause, which provides that the written agreement sets forth the parties' entire understanding. Paragraph 12(c) also states that "[n]o modification or waiver of the terms of this Agreement shall bind [Eagle] or [Matheson] unless in writing and signed and accepted by a duly authorized representative of both parties." Runnels testified that his authority was limited to the package gas business at Eagle Elkhart, and the trial court found in its findings and conclusions that Runnels's testimony was credible. The trial court also found that Runnels's email did not modify all of the agreements and "did not address the means by which future price increase notices would be sent or to which address." The trial court found that Clark's testimony was not credible regarding Eagle's reliance on Runnels's email. Additionally, the trial court found that Walraven's testimony was not credible regarding Eagle's alleged reliance on Runnels's email. Furthermore, Runnels's email was only signed by Runnels, so it did not contain the signature of an authorized representative of Eagle.

The trial court, as factfinder, was the sole judge of the credibility of the witnesses and the weight to be assigned to their testimony. *See Canal Ins. Co.*, 238 S.W.3d at 557 (citing *City of Keller*, 168 S.W.3d at 819). Additionally, the trial judge was free to believe one witness and to disbelieve another. *See id*. The evidence did not conclusively establish accord and satisfaction. *See Richardson*, 235 S.W.3d at 865; *Boland*, 978 S.W.2d at 148. Rather, the evidence demonstrated that both of the emails at issue were signed by persons at Matheson who lacked authority to enter or modify contracts on behalf of Matheson, and they were not signed by an authorized representative of Eagle. *See James Constr. Grp.*, 650 S.W.3d at 403 (holding that courts routinely enforce unambiguous contract language). We conclude that the trial court did not err by finding that Eagle failed to prove accord and satisfaction.

### *Damages Against Eagle Elkhart*

Eagle asserts that Matheson was not entitled to recover damages from Eagle Elkhart for products Matheson supplied to Eagle's DuBois location. According to Eagle, the DuBois plant was acquired by Eagle Railcar Services – Dubois, Pennsylvania, which was not a party to the case, and Eagle Elkhart did not accept or receive the products.

Rule 94 of the Texas Rules of Civil Procedure requires that any matter constituting an avoidance or affirmative defense must be specifically pleaded. TEX. R. CIV. P. 94. A defect of parties is an affirmative defense. *Taylor v. Tristar Risk Mgmt.*, No. 02-19-00398-CV, 2020 WL 2202452, at *2 n.2 (Tex. App.—Fort Worth May 7, 2020, no pet.) (mem. op.). Additionally, Rule 93 requires that a pleading asserting a defect of parties or lack of capacity must be verified. TEX. R. CIV. P. 93; *Taylor*, 2020 WL 2202452, at *2 n.2. In the instant case, Eagle's live pleadings at trial did not specifically plead a defect of parties or lack of capacity, nor did they contain a verified denial.[9] When a defendant does not file a sworn pleading complaining of a defect of parties before trial, such defect is waived. *Santa Fe Petroleum, L.L.C. v. Star Canyon Corp.*, 156 S.W.3d 630, 641 (Tex. App.—Tyler 2004, no pet.). Therefore, we conclude that the trial court did not err by entering judgment in favor of Matheson for products it supplied to Eagle's DuBois location.

## Summation

For the above reasons, we conclude that the trial court did not err by ruling in favor of Matheson on its counterclaim against Eagle for breach of contract as to the notices that substantially complied with the agreements. Accordingly, we sustain issue two in part as to the price increases that were not recoverable and therefore did not substantially comply with the agreements, and we remand the cause to the trial court to determine the actual damages awarded to Matheson in accordance with this opinion, and we overrule issue one in part as to those notices that substantially complied with the agreements. A new trial is not required. *See* TEX. R. APP. P. 44.1(b) (providing that appellate court may not order separate trial solely on unliquidated damages when liability is contested).

## EAGLE'S BREACH OF CONTRACT CLAIM

In issue two, Eagle argues that the trial court erred by denying its breach of contract claim because Matheson breached the agreements by increasing prices in violation of the agreements and ceasing deliveries after Matheson short paid its invoices.

## Standard of Review and Applicable Law

A written agreement is ambiguous only if, after applying established rules of construction, the agreement is susceptible to more than one reasonable meaning. *RSI Int'l, Inc. v. CTC Transp.,*

---

[9] We will discuss the trial court's refusal to allow Eagle a trial amendment in our analysis of Eagle's fourth issue.

*Inc.*, 291 S.W.3d 104, 106 (Tex. App.—Fort Worth 2009, no pet.); *see also* ***Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.***, 940 S.W.2d 587, 589 (Tex. 1996). Our primary concern is to ascertain the parties' true intent as expressed in the instrument. ***Wood Care Ctrs., Inc. v. Evangel Temple Assembly of God of Wichita Falls, Tex.***, 307 S.W.3d 816, 820 (Tex. App.—Fort Worth 2010, pet. denied). If a contract is unambiguous, the court will interpret its terms as a matter of law. ***Coker v. Coker***, 650 S.W.2d 391, 393 (Tex. 1983). We determine the meaning and intent of an unambiguous contract from the four corners of the document. ***Mikob Props., Inc. v. Joachim***, 468 S.W.3d 587, 595 (Tex. App.—Dallas 2015, pet. denied). The construction of an unambiguous contract is a question of law for the court, and we apply a de novo standard of review. ***Tawes v. Barnes***, 340 S.W.3d 419, 425 (Tex. 2011).

## Analysis

As we discussed at length in our analysis of issue one, Matheson substantially complied with the notice provision of the agreements, except as to facility fees, driver availability charges, the cold weather surcharge, and equipment rental fees, and the price increases therefore became effective. *See* ***James Constr. Grp.,*** 650 S.W.3d at 405-06; *see also generally* ***Mikob Props., Inc.***, 468 S.W.3d at 595. Moreover, the agreements specifically and unambiguously state that Matheson may cease deliveries upon breach by Eagle, and the evidence is undisputed that Eagle short paid Matheson's invoices for products it received. *See* ***Coker***, 650 S.W.2d at 393; ***Mikob Props., Inc.***, 468 S.W.3d at 595. Therefore, for the same reasons discussed above, we conclude that except as to the 5% increase in the price of "FG BK," facility fees, driver availability charges, cold weather surcharge, vessel rental charges, and equipment rental fees discussed above, the trial court correctly concluded that Matheson did not breach the agreements. Accordingly, we sustain issue two only to the extent that Matheson improperly charged Eagle for facility fees, driver availability charges, a cold weather surcharge, vessel rental charges, equipment rental fees, and a 5% increase in the price of "FG BK." We overrule issue two as to the remaining price increase notices, which substantially complied with the agreements' notice provisions and therefore went into effect.

### MATHESON'S DECLARATORY JUDGMENT COUNTERCLAIM

In issue three, Eagle argues that the trial court erred by entering judgment in favor of Matheson on its declaratory judgment counterclaim. Specifically, Eagle contends that the trial court's declaration that Eagle received actual and legally binding notice of the price increase

notices was "merely incidental to and already incorporated in the trial court's findings on the parties' breach of contract claims." Eagle asserts that declaratory relief is not available to settle disputes currently pending before a court.

**Standard of Review**

Appellate courts review declaratory judgments under the same standards as other judgments and decrees. TEX. CIV. PRAC. & REM. CODE ANN. § 37.010 (West 2020); ***Truck Ins. Exch. v. Musick***, 902 S.W.2d 68, 69 (Tex. App.—Fort Worth 1995, writ denied). "The trial court's conclusion, being one of law, will be upheld on appeal if it can be sustained on any legal theory supported by the evidence." ***Musick***, 902 S.W.2d at 69.

**Analysis**

The Uniform Declaratory Judgments Act (UDJA) is remedial, and "it is to be liberally construed and administered." TEX. CIV. PRAC. & REM. CODE ANN. § 37.002(b) (West 2020). Section 37.003 of the UDJA provides that a trial court "has the power to declare rights, status, and other legal relations whether or not further relief is or could be claimed[,]" and "[t]he declaration may be either affirmative or negative in form and effect[.]" ***Id***. § 37.003(a), (b) (West 2020). Moreover, the UDJA expressly provides that relief is available in contract cases before or after there has been a breach, so a matured breach is explicitly covered by the UDJA. ***MBM Fin. Corp. v. The Woodlands Operating Co.***, 292 S.W.3d 660, 667 (Tex. 2009); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 37.004(b) (West 2020).

As discussed above, the case began when Eagle sought declaratory relief as to its rights and obligations under the agreements. Specifically, Eagle requested a declaration as to the validity of Matheson's price increases. The UDJA authorizes the trial court to make declarations either affirmatively or negatively; that is, in Eagle's favor or adversely to Eagle, and it explicitly applies to cases involving contracts. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 37.003, 37.004; ***MBM Fin. Corp.***, 292 S.W.3d at 667. We therefore conclude that the trial court did not err by declaring that Eagle received actual and legally binding notice of the price increases Matheson imposed pursuant to the agreements, except as to the notices that purported to increase the price of "FG BK" and purported to impose facility fees, equipment rental fees, a cold weather surcharge, vessel rental charges, and a driver availability charge. Accordingly, we sustain issue three in part and overrule issue three in part; that is, we conclude that the trial court erred by declaring that Eagle received legally binding notice of the purported increases in the price of "FG BK," facility fees,

equipment rental fees, the cold weather surcharge, vessel rental charges, and driver availability charges because the notices of said purported increases were not allowed under the agreements and therefore, the notices for those increases did not substantially comply with the agreements' notice provisions. *See generally* **James Constr. Grp.**, 650 S.W.3d at 405-06.

**REFUSAL TO ALLOW TRIAL AMENDMENT**

In issue four, Eagle argues that the trial court erred by refusing to grant its motion for trial amendment. Eagle sought to amend its pleadings to (1) enter a verified denial stating that Eagle's Dubois facility is not a proper party and (2) enter a specific denial that Matheson's failure to comply with the notice provisions constituted the failure of a condition precedent. Specifically, Eagle sought leave of court to file (1) a second amended petition, which asserted an overpayment claim against Eagle, and (2) a first amended and verified answer to Matheson's counterclaim, which would include a sworn denial that none of the Eagle entities are liable in the capacity in which they are sued as to Matheson's claims pertaining to products delivered to Eagle DuBois and a specific denial stating that conditions precedent to Matheson's recovery did not occur.

Matheson objected to Eagle's request, which was made on day three of the trial, and argued that it constituted unfair surprise and would prejudice Matheson. Matheson maintained that Eagle knew in 2020 of its claim that Eagle Elkhart acquired Rescar's DuBois location because Matheson included that allegation in its second amended counterclaim and re-alleged it in its third amended counterclaim. According to Matheson, Eagle's proposed amendment "raises an entirely new issue that would reshape the trial of Matheson's counterclaim because it would essentially require a mini-trial of the events and communications . . . surrounding . . . Eagle Elkhart's or any other Eagle entity's, acquisition of Rescar Companies and/or assumption of the liabilities[.]" In addition, Matheson pointed out that during discovery, Eagle "vehemently objected" and refused to produce documents in response to numerous requests for production regarding the transaction involving Rescar Companies. Furthermore, Matheson asserted that Eagle's disclosure responses denied knowledge of any defect in parties. The trial court signed an order allowing Eagle's second amended petition to be filed as its live pleading but denied all other relief.

**Standard of Review and Applicable Law**

"[A]ny pleadings, responses or pleas offered for filing within seven days of the date of trial or thereafter . . . shall be filed only after leave of the judge is obtained, which leave shall be granted

by the judge unless there is a showing that such filing will operate as a surprise to the opposite party." TEX. R. CIV. P. 63. If evidence is objected to at trial because it is not pleaded, the court may allow the pleadings to be amended "and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the allowance of such amendment would prejudice him[.]" *Id*. R. 66.

"Generally, a trial court has no discretion to refuse a trial amendment unless (1) the opposing party presents evidence of surprise or prejudice, or (2) the proposed amendment asserts a new cause of action or defense, *and thus is prejudicial on its face*, and the opposing party objects to it." ***Long v. Miken Oil, Inc.***, No. 12-13-00252-CV, 2014 WL 4104100, at *9 (Tex. App.—Tyler Aug. 20, 2014, no pet.) (mem. op.) (emphasis added) (citing ***Chapin & Chapin, Inc. v. Tex. Sand & Gravel Co., Inc.***, 844 S.W.2d 664, 665 (Tex. 1992); TEX. R. CIV. P. 63, 66)). A trial amendment is not mandatory if it changes the nature of the trial. *Id*. If the trial amendment is not mandatory, the decision as to whether to allow or deny it is within the trial court's sound discretion. *Id*.; *see also* ***State Bar of Tex. v. Kilpatrick***, 874 S.W.2d 656, 658 (Tex. 1994). "[A] trial amendment comes too late when the party desires to plead new or independent grounds of recovery or defense that could have been pleaded earlier and that will prejudice the other party." ***Long***, 2014 WL 4104100, at *9.

## Analysis

Despite having notice since 2020 that Matheson was asserting a claim against Eagle for products provided to Eagle's DuBois facility, Eagle did not seek to amend its pleadings until the third day of trial. The record further shows that Eagle resisted discovery as to the details of the transaction by which it acquired Rescar's facility in DuBois. Matheson objected to evidence at trial regarding defect of parties or lack of capacity and explicitly stated that it would not try those issues by consent.

Eagle's request to amend its pleadings to assert lack of capacity and defect of parties, sought to raise an entirely new defense which would have substantially changed the nature of Matheson's presentation of its counterclaim at trial and would have required Matheson to add Eagle's DuBois facility as a party. *See* ***Chapin & Chapin, Inc.***, 844 S.W.2d at 665; ***Long***, 2014 WL 4104100, at *9. We conclude that Eagle's request for trial amendment as to lack of capacity and defect of parties was therefore prejudicial on its face, and the trial court did not abuse its discretion by denying Eagle's request. *See* ***Chapin & Chapin, Inc.***, 844 S.W.2d at 665; ***Long***,

2014 WL 4104100, at *9. Moreover, we conclude that the trial court's refusal to permit a trial amendment as to condition precedent did not cause the rendition of an improper judgment or prevent Eagle from properly presenting its case to this Court. *See* TEX. R. APP. P. 44.1. For all these reasons, we overrule issue four.

AWARD OF ATTORNEY'S FEES TO MATHESON

In issue five, Eagle argues that the trial court erred by awarding "excessive and unsegregated" attorney's fees to Matheson. In cross-point two, Matheson asserts that the trial court erred by awarding it a lower amount of attorney's fees than it requested. We address issue five and cross-point two together.

**Standard of Review and Applicable Law**

We review a trial court's decision to either grant or deny attorney's fees under an abuse of discretion standard, and we review the amount awarded as attorney's fees under a legal sufficiency standard. *EMC Mortg. Corp. v. Davis*, 167 S.W.3d 406, 418 (Tex. App.—Austin 2005, pet. denied). The test for abuse of discretion is whether the trial court acted without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). In conducting our review, we consider the evidence in the light most favorable to the finding and indulge every reasonable inference that would support it. *City of Keller*, 168 S.W.3d at 822. If more than a scintilla of evidence supports the challenged finding, the legal sufficiency challenge fails. *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex. 2003).

Section 37.009 of the UDJA permits recovery of attorney's fees in a declaratory judgment action as long as the fees are proven to be reasonable and necessary, as well as equitable and just. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (West 2020). Additionally, Section 38.001(8) of the Texas Civil Practice and Remedies Code permits recovery of "reasonable attorney's fees" if the claim is for a contract. *Id*. § 38.001(8) (West. Supp. 2022).

**Analysis**

Although Eagle states its argument as a challenge to the sufficiency of the evidence, Eagle conflates evidentiary sufficiency with interpretation of the agreement and of applicable statutes. Despite its broad initial statement of the issue, Eagle only argues that (1) because Matheson recovered under its counterclaim, Matheson did not "institute" a "legal proceeding," and (2) recovery of attorney's fees under the UDJA is unavailable if the request for declaratory relief is

24

merely incidental to other claims. Eagle does not discuss the amount of attorney's fees awarded or the sufficiency of Matheson's evidence regarding its attorney's fees, and Eagle does not discuss the law applicable to segregation of attorney's fees. *See* TEX. R. APP. P. 38.1(i).

We first address Eagle's contention that Matheson did not "institute" a "legal proceeding" by filing its counterclaim and therefore may not recover its attorney's fees pursuant to the agreements. Specifically, Eagle maintains that because it filed the lawsuit rather than Matheson, Matheson did not institute a legal proceeding. The agreements do not define the words "institute" or "legal proceeding." When construing a contract, courts typically give terms their plain, ordinary, and generally accepted meaning. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). "Courts may look to dictionaries to discern the meaning of a commonly used term that the contract does not define." *In re Davenport*, 522 S.W.3d 452, 457 (Tex. 2017). When courts seek to define common and ordinary meanings of legal terms, such as "counterclaim" and "legal proceeding" in this case, "we routinely refer to Black's Law Dictionary." *Intercontinental Grp. P'ship v. KBK Home Lone Star L.P.*, 295 S.W.3d 650, 665 (Tex. 2009).

"Institute" is defined as "to originate and get established: set up: cause to come into existence[.]" WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1171 (2002). Similarly, Black's Law Dictionary defines "institute" as "[t]o begin or start; commence[.]" BLACK'S LAW DICTIONARY 917 (10th ed. 2014). The word "legal" means "of or relating to law[,]" and "proceeding" is defined as "a particular step or series of steps adopted for doing or accomplishing something[.]" WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1290, 1807 (2002). Black's Law Dictionary defines "proceeding" as follows: "The regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment" and "[a]ny procedural means for seeking redress from a tribunal[.]" BLACK'S LAW DICTIONARY 1398 (10th ed. 2014). A "counterclaim" is "[a] claim for relief asserted against an opposing party after an original claim has been made[.]" BLACK'S LAW DICTIONARY 427 (10th ed. 2014). "To qualify as a claim for affirmative relief, a defensive pleading must allege that the defendant has a cause of action, independent of the plaintiff's claim, on which he could recover benefits, compensation, or relief, even though the plaintiff may abandon his cause of action or fail to establish it." *Le v. Kilpatrick*, 112 S.W.3d 631, 634 (Tex. App.—Tyler 2003, no pet.). "A defendant does not seek affirmative relief by claims that merely resist the plaintiff's right to recover." *Id*.

Applying the above definitions and case law to the instant case, we conclude that Matheson's counterclaims, by which it sought declaratory judgment and asserted its own claims against Eagle for breach of the agreements, constituted a "legal proceeding" that Matheson "instituted." *See id*. Matheson's counterclaims did not merely resist Eagle's right to recover. *See id*. Because the contract expressly provided that Matheson could recover its attorney's fees if it prevailed, and Chapter 38 of the Texas Civil Practice and Remedies Code permits recovery of attorney's fees in contract actions, we conclude that the trial court did not err by awarding attorney's fees to Matheson. *See* Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8); *see* ***James Constr. Grp.***, 650 S.W.3d at 403 (holding that courts routinely enforce unambiguous contract language); *see generally* ***Heritage Res., Inc.***, 939 S.W.2d at 121. Having concluded that Section 38.001(8) authorized Matheson to recover its attorney's fees, we need not consider the propriety of granting attorney's fees under the UDJA.[10] *See* Tex. R. App. P. 47.1; *see also* Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8); ***Material P'ships, Inc. v. Ventura***, 102 S.W.3d 252, 257 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (holding that appellate court will uphold conclusions of law if judgment can be sustained on any legal theory supported by the evidence). Finally, even had Eagle properly briefed its argument that Matheson was required to segregate its attorney's fees, we conclude that Eagle waived this argument by failing to raise it in the trial court. *See* ***Jespersen v. Sweetwater Ranch Apts.***, 390 S.W.3d 644, 662 n.3 (Tex. App.—Dallas 2012, no pet.) (citing ***Green Int'l, Inc. v. Solis***, 951 S.W.2d 384, 389 (Tex. 1997)). However, because we conclude that Eagle did not breach the agreements by refusing to pay the purported increase in the price of "FG BK," equipment rental fees, facility fees, driver availability charges, and the cold weather surcharge, we remand the issue of attorney's fees to the trial court to consider whether an offset is appropriate and, if so, in what amount. *See generally* Tex. Civ. Prac. & Rem. Code Ann. § 38.001; Tex. R. App. P. 43.2(d), 44.1(b). For all these reasons, we sustain issue five in part and overrule issue five in part.

We now turn to cross-point two, in which Matheson asserts that the trial court erred by failing to award it the full amount of attorney's fees it requested. Specifically, Matheson asserts

---

[10] The trial court's judgment did not specify the legal theory under which it awarded attorney's fees to Matheson. In conclusion of law number thirty-three, the trial court determined that Eagle's conduct required Matheson to assert legal claims under the agreements, and Matheson is therefore entitled to recover its attorney's fees. Additionally, the trial court found in conclusion of law number thirty-six that Matheson is also entitled to recover attorney's fees under the UDJA.

Paragraph 12(a) of the agreements states that if Matheson prevails after instituting a legal proceeding, "[Eagle] shall pay all of [Matheson]'s costs and expenses (including attorneys' fees)[.]" In its judgment, the trial court awarded Matheson "[r]easonable and necessary" attorney's fees as follows: $63,232.95 from Eagle Elkhart, $62,345.75 from Eagle Roscoe, $62,345.75 from Eagle Wichita Falls, and $74,253.56 from Eagle Cairo, for a total attorney's fee recovery of $262,178.01. According to Matheson, the trial court's reduction of its attorney's fees requires rewriting the parties' agreements, which do not limit attorney's fees to those that are reasonable and necessary.

At trial, Matheson's lead trial counsel, Mike Seeley, testified that he works primarily in commercial litigation, and he described the instant case as complex. Seeley opined that the rates charged by his law firm are reasonable, "particularly for this kind of work." Seeley explained that the primary billing attorneys were himself and two other attorneys, as well as support staff, and he testified that two additional attorneys from his firm's offices in other cities attended some depositions to save travel costs. Seeley testified regarding his hourly rate, as well as the rates of the other two primary billing attorneys, and he stated that his firm billed Matheson $419,496.32 as of November 28, 2021. This amount represented 1,089.30 hours of legal work, and Seeley opined that the fees were reasonable and necessary for the east Texas area. Seeley also stated that expenses amounted to $17,467.03. He testified that although some of the fees could be segregated, segregating all the fees was impossible because the various claims are inextricably intertwined. Seeley's firm's invoices to Matheson from the beginning of the case were also admitted into evidence as exhibits. The invoices showed the tasks performed, the identity of the attorney or support staff member who performed the task, and the amount of time spent on each task.

Attorney's fees are not recoverable unless authorized by statute or contract. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310-11 (Tex. 2006). "When fee-shifting is authorized, the party seeking to recover those fees bears the burden of establishing the fees are reasonable and necessary." *In re Nat'l Lloyds Ins. Co.*, 532 S.W.3d 794, 809 (Tex. 2017). An agreement to pay attorney's fees implies that such fees be reasonable and necessary. *Kurtz v. Kurtz*, 158 S.W.3d 12, 18-19 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (citing *Girard Fire & Marine Ins. Co. v. Koenigsberg*, 65 S.W.2d 783, 785 (Tex. Civ. App.—Dallas 1933, no writ)); *see Sieber & Calicutt, Inc. v. La Gloria Oil & Gas Co.*, 66 S.W.3d 340, 350-51 (Tex. App.—Tyler 2001, pet. denied). The Texas Supreme Court has held that to recover attorney's fees from an opponent, the

prevailing party must prove that recovery of the fees is legally authorized and that the attorney's fees are reasonable and necessary. ***Rohrmoos Venture v. UTSW DVA Healthcare, LLP***, 578 S.W.3d 469, 487 (Tex. 2019). Therefore, "only fees reasonable and necessary for the legal representation will be shifted to the non-prevailing party, and not necessarily the amount contracted for between the prevailing party and its attorney, as a client's agreement to a certain fee arrangement or obligation to pay a particular amount does not necessarily establish that fee as reasonable and necessary." *Id*. at 487-88.

In support of its argument, Matheson cites ***Basic Energy Servs., L.P. v. EXCO Res., L.P.***, No. 05-15-00667-CV, 2018 WL 564157 (Tex. App.—Dallas Jan. 26, 2018, pet. denied) (mem. op.). There, Basic Energy appealed the trial court's judgment, in which the court found that Basic Energy owed a duty to defend and indemnify each of the appellees pursuant to a master service and supply agreement between Basic and EXCO. *Id*., 2018 WL 564157, at *1. The Dallas Court of Appeals noted that it construes indemnity agreements under normal rules of contract construction, and "[t]he rule of strictissimi juris applies so that the indemnitor is entitled to have its agreement strictly construed." *Id*. at *3-4. In determining whether the indemnity provision, which included "all expenses of litigation, court costs[,] and attorney's fees," required the appellees to prove that their attorney's fees were reasonable and necessary, the ***Basic Energy*** court noted that the contract did not require scrutiny of attorney's fees for reasonableness. *Id*. at *7. The court also noted that the indemnity agreement specifically provided that one sophisticated commercial entity would "defend, indemnify, hold harmless, and release" another sophisticated entity and its subcontractors "from and against . . . liability of every kind, including all expenses of litigation, court costs and attorneys' fees[.]" *Id*. In doing so, the court distinguished the particular facts before it from those present in other opinions, in which it concluded that an agreement to pay an unspecified amount of attorney's fees implies a reasonable fee. *Id*. at *7, n.6. The ***Basic Energy*** court held that the parties were free to negotiate the indemnity agreement as they saw fit and declined "to impose additional procedures beyond those they chose for themselves." *Id*. at *7.

We conclude that the parties' agreements requiring Eagle to pay Matheson's attorney's fees implied a requirement that such fees be reasonable and necessary. *See **Rohrmoos Venture***, 578 S.W.3d at 487-88; ***Kurtz***, 158 S.W.3d at 18-19; ***Koenigsberg***, 65 S.W.2d at 785; ***Sieber & Calicutt***, 66 S.W.3d at 350-51; *see also **R2 Restaurants, Inc. v. Mineola Comty. Bank, SSB***, 561

S.W.3d 642, 660 (Tex. App.—Tyler 2018, pet. denied) (holding that a "'reasonable' attorney's fee is one that is not excessive or extreme, but rather moderate or fair[]"). We further conclude that the holding of **Basic Energy** is limited to its particular facts and is therefore inapposite to the instant case. *See generally* **Basic Energy Servs.**, 2018 WL 564157 at *7. Matheson has not demonstrated that the trial court abused its discretion by reducing its requested attorney's fees to an amount the court found to be reasonable and necessary.[11] *See* **Downer**, 701 S.W.2d at 241-42. Accordingly, we overrule cross-issue two.

### LOST PROFITS

In cross-point one, Matheson contends the trial court erred by failing to award it damages for lost profits because the trial court found in its findings of fact and conclusions of law that Matheson is a lost volume seller. Specifically, Matheson argues that the trial court's judgment, which does not award Matheson lost profits, irreconcilably conflicts with its findings of fact and conclusions of law.[12] Matheson asks this Court to render a judgment in its favor as to its lost profits of $70,552.64. Eagle argues that there is no conflict, or that any conflict is reconcilable. Eagle also argues that if this Court determines such an irreconcilable conflict exists, remand is necessary. Furthermore, Eagle challenges the legal and factual sufficiency of the evidence supporting the trial court's finding that Matheson is a lost volume seller.

**Standard of Review and Applicable Law**

"In an appeal from a judgment after a bench trial, we accord the trial court's findings of fact the same weight as a jury's verdict." **Milton M. Cooke Co. v. First Bank & Trust**, 290 S.W.3d 297, 302 (Tex. App.—Houston [1st Dist.] 2009, no pet.); (citing **Brown v. Brown**, 236 S.W.3d 343, 347 (Tex. App.—Houston [1st Dist.] 2007, no pet.)). Unchallenged findings of fact are binding on an appellate court unless the contrary is established as a matter of law or there is no evidence to support the finding. **Walker v. Anderson**, 232 S.W.3d 899, 907 (Tex. App.—Dallas

---

[11] We note that in its post-trial brief setting forth the damages it sought against the various Eagle entities, Matheson requested "[r]easonable and necessary attorneys' fees[.]"

[12] Based on our review, the record is not clear as to the circumstances preceding the entry of the trial court's findings of fact and conclusions of law. Counsel for Matheson admitted at oral argument that he drafted the findings of fact and conclusions of law after being directed to do so by the trial court, yet the findings of fact and conclusions of law conflict with the judgment entered by the trial court. Counsel always can submit additional findings of fact and conclusions of law advocating for more relief for his client, but in recognition of his duty of candor to the court, he should acknowledge the potential conflict between the proposed findings and the judgment signed by the court.

2007, no pet.) (citing *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *Mullins v. Mullins*, 202 S.W.3d 869, 874, 876-77 (Tex. App.—Dallas 2006, pet. denied)). When an appellant challenges a trial court's findings of fact, we review those fact findings by the same standards we use to review the sufficiency of the evidence to support a jury's findings. *Pulley v. Milberger*, 198 S.W.3d 418, 426 (Tex. App.—Dallas 2006, pet. denied).

We review a trial court's conclusions of law de novo and independently evaluate them to determine whether the court correctly drew its legal conclusions from the facts. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). We will uphold conclusions of law on appeal if the judgment can be sustained on any legal theory supported by the evidence. *Mack v. Landry*, 22 S.W.3d 524, 528 (Tex. App.—Houston [14th Dist.] 2000, no pet.). Findings of fact and conclusions of law filed after the judgment is signed are controlling if there is any conflict between them. *In re R.J.P.*, 179 S.W.3d 181, 184 n.3 (Tex. App.—Houston [14th Dist.] 2005, no pet.); *Capital Sr. Mgmt. 1, Inc. v. Tex. Dept. of Human Servs.*, 132 S.W.3d 71, 74 n.3 (Tex. App.—Austin 2004, pet. denied).

In reviewing the legal sufficiency of the evidence, we must consider all the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *City of Keller*, 168 S.W.3d at 822. We must consider evidence favorable to the finding if a reasonable factfinder could do so, and we must disregard contrary evidence unless a reasonable factfinder could not disregard it. *Id*. at 827. We will sustain a legal sufficiency challenge if the record shows one of the following: (1) a complete absence of a vital fact; (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *Id*. at 810.

When considering a factual sufficiency challenge, we must consider and weigh all the evidence, not just that which supports the findings. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406-07 (Tex. 1998); *Thompson v. Houk*, No. 12-04-00315-CV, 2005 WL 2035831, at *2 (Tex. App.—Tyler, Aug. 24, 2005, no pet.) (mem. op.). We may set aside a finding only if it is so contrary to the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996).

**Analysis**

In its findings of fact, the trial court found that Eagle Cairo's overdue amount for past due invoices and unpaid interest was $7,494.65. With respect to lost profits, the trial court noted that Lauck testified that Eagle lost profits in the amounts of $11,977.87 and $58,574.77 and "Eagle did not call any expert to refute Mr. Lauck's testimony." The trial court did not explicitly find that Matheson lost profits in the above amounts or the sum of those amounts ($70,552.64). In its conclusions of law, the trial court determined that "Matheson is a lost volume seller and is therefore entitled to damages for its 'lost volume' as a result of Eagle Cairo's breach." Additionally, the trial court concluded that Eagle repudiated the agreements by refusing to pay for the goods and services Matheson provided. The trial court further concluded that "[a]bsent Eagle Cairo's breach of its [a]greement with Matheson, Matheson would have successfully solicited other purchasers and was willing and able to perform additional agreements for the purchase of its goods. Because Matheson would have entered into both [of] those agreements absent the breach and would have performed both agreements, Matheson lost volume as a result of Eagle Cairo's breach." Furthermore, the trial court concluded, "[b]ased on the credible testimony of Rick Lauck, Matheson is a 'lost volume seller,' and is therefore entitled to recover damages for its lost volume." The trial court's judgment awarded Matheson damages of $7,494.65 against Eagle Cairo but did not award Matheson damages for its lost profits.

As support for its conclusion that Matheson is a lost volume seller, the trial court cited Section 2.708(b) of the Texas Business Commerce Code, as well as ***USX Corporation v. Union Pacific Resources Company*** and ***Malone v. Carl Kisabeth Company, Incorporated***. TEX. BUS. & COM. CODE ANN. § 2.708(b) (West 2009); ***USX Corp. v. Union Pacific Res. Co.***, 753 S.W.2d 845, 848 (Tex. App.—Fort Worth 1988, no writ); ***Malone v. Carl Kisabeth Co.***, 726 S.W.2d 188, 190 (Tex. App.—Fort Worth 1987, writ ref'd n.r.e.). Section 2.708 (b) provides as follows:

> If the measure of damages provided in Subsection (a) is inadequate to put the seller in as good a position as performance would have done[,] then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages . . ., due allowance for costs reasonably incurred[,] and due credit for payments or proceeds of resale.

TEX. BUS. & COM. CODE ANN. § 2.708(b). Subsection (a) provides that "the measure of damages for non-acceptance or repudiation by the buyer is the difference between the market price at the

31

time and place for tender and the unpaid contract price together with any incidental damages . . . , but less expenses saved in consequence of the buyer's breach." *Id*. § 2.708(a). "A seller is a lost volume seller if the purchaser at resale would have been solicited by the seller had there been no breach, the solicitation would have been successful, and the seller could have performed the additional contract." *Malone*, 726 S.W.2d at 190. Section 2.708(b) gives an aggrieved seller an alternative profit formula for remedial damages, and the alternative formula applies "to all sellers who are left with 'lost volume' as a result of the buyer's breach[.]" *USX Corp.*, 753 S.W.2d at 848.

As discussed above, Lauck testified regarding the Matheson's lost profits and stated that Matheson also could have supplied nitrogen to other buyers. The trial court found Matheson's testimony credible and noted that no controverting expert testimony was introduced. The trial court also stated that it found Lauck's testimony credible. Viewing all the evidence in the light most favorable the trial court's findings and deferring to the trial court's role as factfinder, we conclude that the evidence regarding Matheson's lost profits was legally sufficient. *See City of Keller*, 168 S.W.3d at 822. In addition, viewing all the evidence, we conclude that the trial court's findings were not so contrary to the great weight and preponderance of the evidence that they are clearly wrong and unjust. Therefore, the evidence supporting the findings was factually sufficient. *See Ellis*, 971 S.W.2d at 406-07; *Houk*, 2005 WL 2038531, at *2.

We turn now to Matheson's argument that the trial court's findings of fact and conclusions of law irreconcilably conflict with its judgment. An appellate court may not set aside a judgment due to conflicting findings if the findings can be reconciled. *Estate Land Co. v. Wiese*, No. 14-13-00524-CV, 2015 WL 1061553, at *4 (Tex. App.—Houston [14th Dist.] Mar. 10, 2015, pet. denied) (mem. op.) "We must reconcile apparent conflicts where there is any reasonable basis to do so." *Id*. As stated above, although the trial court found that (1) Eagle Cairo's overdue amount for past due invoices and unpaid interest was $7,494.65, (2) Matheson is a lost volume seller, (3) Eagle Cairo repudiated the agreement, (4) Lauck's testimony was credible, (5) Matheson is entitled to damages for its lost volume resulting from Eagle Cairo's breach, and (6) if Eagle Cairo had not breached the agreement, Matheson would have successfully solicited other purchasers, the trial court only awarded Eagle damages of $7,494.65 (which the court found was the amount of Matheson's unpaid invoices plus interest). We conclude that the trial court's judgment, which did not award Matheson any damages as a lost volume seller, irreconcilably conflicts with its findings.

32

As explained above, when the trial court's findings and its judgment conflict, the findings control. *See **In re R.J.P.***, 179 S.W.3d at 184 n.3; ***Capital Sr. Mgmt. 1, Inc.***, 132 S.W.3d at 74 n.3.

Because the trial court did not make an explicit finding regarding the amount of damages Matheson should receive as a lost volume seller, we conclude that remand is necessary. *See* TEX. R. APP. P. 43.3 (when reversing trial court's judgment, appellate court must render judgment trial court should have rendered unless remand is necessary for further proceedings or interests of justice require remand). We sustain cross-issue one and reverse the trial court's judgment solely as to the issue of Matheson's lost profits and remand the cause to the trial court to make a finding regarding what amount of damages Matheson is entitled to recover for lost volume, and for entry of a judgment that is congruent with its finding that Matheson is a lost volume seller and is entitled to recover such damages. *See id.* R. 44.1. A new trial is not required. *See id.* R. 44.1(b) (providing that appellate court may not order separate trial solely on unliquidated damages when liability is contested).

## DISPOSITION

Having sustained Eagle's first, second, third, and fifth issues in part, having sustained Matheson's first cross-point, and having overruled the remainder of Eagle's issues and Matheson's second cross-point, we ***reverse in part*** and ***remand*** the cause for further proceedings regarding (1) reformation of the trial court's declaration in favor of Matheson, (2) Matheson's claim for lost profits as a lost volume seller, (3) recalculation of Matheson's actual damages in light of Eagle's valid claim for breach of contract as to the purported 5% increase for "FG BK," facility fees, the equipment rental fee, the cold weather surcharge, the vessel rental charge, and the driver availability charge, and (4) determination of whether an offset of a portion of Matheson's attorney's fees is appropriate and, if so, in what amount. In all other respects, we ***affirm*** the trial court's judgment.

GREG NEELEY
Justice

Opinion delivered July 21, 2023.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

33



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

## JULY 21, 2023

### NO. 12-22-00103-CV

**EAGLE RAILCAR SERVICES, L.P., EAGLE RAILCAR SERVICES - ROSCOE, INC., EAGLE RAILCAR SERVICES - CAIRO, OHIO, LLC AND EAGLE RAILCAR SERVICES - WICHITA FALLS, TEXAS, LLC,**
Appellants/Cross-Appellees
V.
**MATHESON TRI-GAS, INC.,**
Appellee/Cross-Appellant

Appeal from the 3rd District Court
of Anderson County, Texas (Tr.Ct.No. DCCV19-0805-3)

THIS CAUSE came to be heard on the oral arguments, appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that the judgment of the court below should be reversed in part and remanded, and affirmed in part.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below be **reversed in part** and **remanded** for further proceedings as to Cross-Appellant/Appellee Matheson Tri-Gas, Inc.'s claim for damages as a lost volume seller, the amount of attorney's fees awarded to Matheson Tri-Gas, Inc., the trial court's declaration, and recalculation of Matheson's actual damages in light of Eagle's valid claim for breach of contract

as to fees and charges in the price increase notices that do not substantially comply with the parties' contracts. In all other respects, the judgment of the trial court is **affirmed**.

It is further ORDERED that each party will bear its own costs; and that this decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*